[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 27, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11582

_____

D. C. Docket No. 04-02608-CV-WSD-1

COMMUNITY STATE BANK,
CASH AMERICA FINANCIAL SERVICES, INC.,
CASH AMERICA INTERNATIONAL, INC.,
GEORGIA CASH AMERICA, INC.,
DANIEL R. FEEHAN,

Petitioners-Appellants,

versus

JAMES STRONG,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(April 27, 2007)**

Before CARNES and MARCUS, Circuit Judges, and JORDAN,[*] District Judge.

_____

[*] Honorable Adalberto J. Jordan, United States District Judge for the Southern District of
Florida, sitting by designation.

MARCUS, Circuit Judge:

At issue today is whether the district court erred in dismissing, for lack of subject matter jurisdiction, the petition of a bank and its servicing affiliates to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4. After thorough review, we conclude that the district court did indeed have subject matter jurisdiction. Under the binding law of this circuit, a district court has federal question jurisdiction over a § 4 petition to compel arbitration if the underlying dispute to be arbitrated itself states a federal question. Because at least one of the claims petitioners seek to arbitrate states a federal question, the district court had federal question jurisdiction over the petition to compel arbitration. Accordingly, we reverse and remand to the district court for further proceedings consistent with this opinion.

## I. __Background__

This action arises out of a "payday" loan -- a small, high-interest loan due to be repaid within a few weeks, usually on the borrower's next pay day. Many states, including Georgia, have various usury laws that generally prohibit such high-interest loans. Thus, no one doubts that when so-called "payday stores" extend loans directly to Georgia residents -- that is, without the involvement of any out-of-state bank -- they may not charge interest in excess of that permitted under Georgia law. However, Section 521 of the Depository Institutions Deregulation and Monetary Control Act

2

of 1980, 12 U.S.C. § 1831d ("DIDA"), codified as Section 27 of the Federal Depository Insurance Act ("FDIA") (hereinafter "Section 27"), expressly permits state-chartered, FDIC-insured banks to export the favorable interest rates of the state in which they are located to borrowers in other states, "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section."[1] Some states, such as South Dakota, place no limitation on the amount of interest such banks can charge.[2]  Thus, none of the parties appears to doubt that when an FDIC-insured bank chartered in South Dakota extends loans directly to Georgia residents, it may charge whatever interest rates it wishes, notwithstanding Georgia law to the contrary.

The legal gray area occurs when such out-of-state banks "partner" with Georgia payday stores to extend loans to Georgians.  Such partnerships have been the subject

---

[1] Section 27(a) provides, in relevant part:

In order to prevent discrimination against State-chartered insured depository institutions...with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank...would be permitted to charge in the absence of this subsection, such State bank...may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section,...charge on any loan...interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank...or at the rate allowed by the laws of the State...where the bank is located, whichever may be greater.

[2] See S.D. Codified Laws § 54-3-1.1 (2006) (providing that the rate of interest is set by written agreement, with "no maximum interest rate...or usury rate restriction").

of much litigation, not only in Georgia, but in other states with usury laws. Generally speaking, the banks and the payday stores argue that the payday store merely markets, services, and collects local loans on behalf of the out-of-town bank, which, they say, is the true lender. As a result, they say, the loans are extended by the bank, and their high interest rates are protected by Section 27. Not surprisingly, borrowers, consumer advocacy groups, and some states argue to the contrary that this alleged agency relationship is a sham, and that the local payday stores, which do not enjoy the protection of Section 27, are the true lenders. Therefore, they conclude, the interest rates on the loans issued by the payday stores are governed by state law, under which they are usurious.

On February 6, 2004, respondent James E. Strong ("Strong"), a Georgia resident, visited one of seventeen payday stores owned and operated by petitioner Georgia Cash America, Inc., a Georgia corporation. Georgia Cash America is an affiliate of petitioners Cash America Financial Services, Inc., a Delaware corporation, and Cash America International, Inc., a Texas corporation. Petitioner Daniel Feehan is the Chief Executive Officer of all three Cash America entities (collectively, "Cash America"). According to petitioners, Cash America markets, services, and collects payday loans on behalf of petitioner Community State Bank ("the bank"), an FDIC-insured bank chartered by the state of South Dakota. Strong took out a loan for $200,

4

which he promised to repay by March 3, 2004, along with a $36 "finance charge." As the promissory note he signed disclosed, the finance charge is the equivalent of an annual percentage rate of 252.692%. The note also stated that the contract involved interstate commerce and was subject to the Federal Arbitration Act ("FAA"), and that by signing, Strong acknowledged that "[a]ny controversy or claim" between himself and either the bank or Cash America "arising out of or in any way relating to" the loan "shall be settled by binding [individual] arbitration...with the sole exception of collection actions by [the bank]." Pet. Ex. B at 2. Finally, the note clearly identified the bank as the lender, and stated that Strong, by signing, acknowledged that the bank had contracted with Cash America to assist with the loan, but that Cash America was not "owned by, operated by, or affiliated with" the bank and had no authority to make or renew loans. Id.

Nevertheless, instead of repaying his loan, Strong commenced what he characterized as a class action lawsuit against Georgia Cash America, Cash America International, and Feehan ("state defendants") -- but not the bank or Cash America Financial Services -- in Georgia state court (the "state court action"). See Strong v. Ga. Cash Am., Inc., No. 2004A7104-6 (Ga. St. Ct.).[3] The state court complaint

---

[3] The state court action is one of three nearly identical lawsuits filed in Georgia state court involving most of the same parties and counsel. See Strong v. Ga. Cash Am., Inc., No. 2004A7104-6 (State Ct. of Cobb County, Ga.); King v. Advance Am. Leasing Servs., Inc., No.

5

broadly asserted six causes of action arising under Georgia statutory and common law,[4] all essentially alleging that the loan is usurious and therefore unenforceable. Strong's theory, as alleged in his state court complaint, was that the bank had "little involvement" in the transaction "other than lending its name," that Cash America was thus the "de facto lender," and that Cash America's partnership with the bank was a "mere subterfuge" designed to allow Cash America to skirt Georgia's usury laws.

2004A7102-6 (State Ct. of Cobb County, Ga.); Strong v. First Am. Cash Advance of Ga., LLC, No. 04VS070349C (State Ct. of Fulton County, Ga.). All three state court actions bring state law claims against Georgia payday businesses and do not name the bank as a defendant. In each, the defendants removed the case to the U.S. District Court for the Northern District of Georgia, alleging federal question and, in some cases, diversity jurisdiction; the three removed cases were deemed to be related and assigned to the same district judge. See Strong v. Ga. Cash Am., Inc., No. 04-2611 (N.D. Ga.); King v. Advance Am. Leasing Servs., Inc., No. 04-2618 (N.D. Ga.); Strong v. First Am. Cash Advance of Ga., LLC, No. 04-2610 (N.D. Ga.). In addition, the defendants in each state court action, together with the bank, initiated an independent civil action before the same district court judge seeking, under §§ 3 and 4 of the FAA, to compel arbitration and stay the proceedings of the companion removed state action. (In Advance America, petitioners also sought a declaration from the district court, under the Declaratory Judgment Act, 28 U.S.C. § 2201, that any disputes between the parties arising from the loan were subject to arbitration under the parties' agreement.) See Cmty. State Bank v. Strong, No. 04-2608 (N.D. Ga.); Advance Am. v. King, No. 04-2765 (N.D. Ga.); Cmty. State Bank v. Strong, No. 04-2609 (N.D. Ga.). Soon thereafter, the state court action plaintiff or plaintiffs sought to remand each of the removed cases and to dismiss each of the independent FAA actions for lack of subject matter jurisdiction. In an order entered on December 13, 2005, the district judge granted the motions to remand all three state court actions. In an additional order entered on February 7, 2006, the district court granted the motions to dismiss all three independent FAA petitions. It is the district court's dismissal of one of the independent FAA petitions, Cmty. State Bank v. Strong, No. 04-2608 (N.D. Ga.), that we review today.

[4] Specifically, Strong alleged violations of the Georgia Industrial Loan Act, O.C.G.A. § 7-3-1, et seq.; the Georgia Usury Statute, O.C.G.A. § 7-4-2(a)(2); the Georgia Criminal Usury Statute, O.C.G.A. § 7-4-18(a); the Georgia Payday Lending Statute, O.C.G.A. § 16-17-1, et seq.; the Georgia Check Cashing Statute, O.C.G.A. § 7-1-700, et seq.; and the Georgia Racketeer Influenced and Corrupt Organizations ("RICO") Act, O.C.G.A. § 16-14-1, et seq. Strong also brought conversion and conspiracy claims under Georgia common law.

Pet. Ex. A ¶¶ 25-26. The complaint also asserted that the arbitration provision was "unconscionable" and "unenforceable." Id. ¶ 40. The state court complaint specifically averred that it did not raise any federal causes of action, including an action arising under the FDIA; did not state any cause of action against any bank; and did not seek recovery in excess of $75,000.

In response, the state defendants (Georgia Cash America, Cash America International, and Feehan) -- along with the bank -- served Strong with a Notice of Intent to Arbitrate pursuant to the terms of the agreement. The letter referred to Strong's state lawsuit challenging the loan as void and unenforceable, and claimed that the loan was indeed lawful. Specifically, the letter said that contrary to Strong's allegations, the loan was made by the bank, not by Cash America, and thus that the legality of the interest was governed by Section 27 of the FDIA, not by Georgia usury law. The letter then demanded that Strong dismiss his state court lawsuit and participate in individual, binding arbitration. Strong, through counsel, responded that he believed the contract he entered into with Cash America was "unconscionable and unenforceable," and thus that he intended to pursue his class action suit in state court. Pet. Ex. D at 1.

On September 7, 2004, Strong's opponents took two actions in response. First, the state court defendants -- Georgia Cash America, Cash America International, and

Feehan -- removed that action to the United States District Court for the Northern District of Georgia, basing removal jurisdiction on the theory that Section 27 completely preempts Strong's Georgia usury claims, and thus that Strong's state court complaint necessarily stated a federal question. See Strong v. Ga. Cash Am., Inc., No. 04-2611 (N.D. Ga.). Strong moved to remand for lack of subject matter jurisdiction, claiming that removal had been improvidently granted. While that motion was pending, the defendants moved, under the FAA, to stay the proceedings and compel arbitration of "the claims of Plaintiff James E. Strong." Strong opposed that motion and moved for expedited discovery as to the enforceability of the arbitration agreement. After hearing both sets of motions, the district court granted Strong's motion for remand, holding that Section 27 does not completely preempt Strong's Georgia usury claims against Cash America, and thus that Strong's state court complaint did not state a federal question and was not removable.[5]

Second, the state court defendants -- along with both the bank and Cash America Financial Services -- commenced the instant independent action in the same United States district court by filing a Verified Petition to Compel Arbitration and

_____

[5] Defendants in the related case of Strong v. First Am. Cash Advance of Ga., LLC, No. 04-2610 (N.D. Ga.), see supra note 3, appealed the district court's order remanding that case. This Court issued an order sua sponte dismissing the appeal for lack of appellate jurisdiction under 28 U.S.C. § 1447(c) and (d). See Strong v. First Am. Cash Advance of Ga., LLC, No. 06-10541 (11th Cir., Feb. 24, 2006). Whether the district court improperly remanded is not before us, and we express no opinion on that issue.

Stay Judicial Proceedings, under §§ 3[6] and 4[7] of the FAA.  See Cmty. State Bank v.

---

[6] Petitioners brought a cause of action not only under § 4 of the FAA, but also under § 3 of the FAA, which provides that where a suit is brought "in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending...shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3 (emphasis added).  Leaving aside the question of whether § 3 is even applicable in this case (since the suit the petitioners sought to stay -- Strong's state-court suit -- was pending not in the district court but in state court), we find that petitioners have waived review of the district court's dismissal of this cause of action.  In their briefs, petitioners fail to put forth any argument why the district court erred in dismissing their § 3 cause of action, and in their Response to Strong's Suggestion of Mootness, petitioners similarly only insist that a live § 4 case exists without even mentioning their § 3 cause of action.  A § 3 cause of action is distinct from a § 4 cause of action.  This circuit's rule that federal question jurisdiction over a § 4 cause of action lies where the dispute to be arbitrated states a federal question is based on the jurisdictional language of § 4 itself, see infra Part II.A; the same language does not readily support a finding of federal question jurisdiction over a § 3 cause of action.  We, therefore, conclude that the petitioners have abandoned the issue of whether the district court erred in dismissing their § 3 cause of action.  See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (stating that passing references to issues are insufficient to raise a claim for appeal, and such issues are deemed abandoned).

[7] Section 4 of the FAA provides:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement....The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement....If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof....If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed.  If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

Strong, No. 04-2608 (N.D. Ga.). The petition alleges that the promissory note Strong signed includes an arbitration provision, under which all claims and disputes with respect to the loan must be individually resolved through binding arbitration; that Strong and the petitioners dispute "whether [the] loan...is governed by Section 27...as opposed to state law," Pet. at 1-2; that petitioners Community State Bank, Georgia Cash America, Cash America International, and Feehan demanded that Strong arbitrate all disputes arising out of the loan, but that Strong refused; and that Strong's refusal to arbitrate threatens petitioners with severe injury.

The petition alleges federal question jurisdiction under 28 U.S.C. § 1331[8], and, pursuant to the jurisdictional requirements of § 4 of the FAA,[9] recites that "[s]ave for the Arbitration Provision, this Court would have jurisdiction under Title 28 of the United States Code in a civil action of the subject matter of a suit arising out of the controversy between the parties." Pet. ¶ 8. The petition asserts that "[b]ased on the allegations currently set forth in the State Complaint, including allegations that the Cash America Petitioners violated the Georgia [RICO] statute, [Strong] is in a position, if he chose, to amend the State Complaint to allege violations against

_____

[8] The petition also alleged that "[t]o the extent that this Court does not have federal question jurisdiction with respect to any party and/or any claim, this Court has supplemental jurisdiction with respect to such party and/or claim under 28 U.S.C. § 1367(a)." Pet. ¶ 13.

[9] See supra note 7.

10

Petitioners of the federal [RICO] Act, 18 U.S.C. §§ 1961 et seq." Id. ¶ 10. The petition also avers that the plaintiffs wish to arbitrate not only Strong's state-court claims, but also that "[i]n the arbitration demanded by this Petition, Petitioners will seek a declaration that the interest on [Strong's] Loan is governed by Section 27 and that the Loan is lawful." Id. ¶ 11 (emphasis added).

Strong moved to dismiss this independent FAA petition for lack of subject matter jurisdiction. Characterizing the disputes petitioners seek to arbitrate as his own state-court claims, Strong argued that even if usury claims against state-chartered banks are completely preempted by federal law (although, he suggested, they are not), his state-court complaint did not raise any usury claims against any bank. Thus, he argued, his state-court claims do not state a federal question and thus do not provide the district court with subject matter jurisdiction over the instant petition to compel arbitration.

The district court agreed with Strong, and granted Strong's motion to dismiss the FAA petition to compel arbitration for lack of subject matter jurisdiction. The district court, too, characterized the claims to be arbitrated as those "asserted in the State-Court Action" and, reiterating the reasoning of its remand order in the parallel state court action, again held that Strong's state complaint did not state a federal question. Specifically, the court determined that Section 27 does not completely

preempt Georgia law usury claims against state-chartered banks, and that even if it did, Strong's complaint stated no such claims against any bank.

Petitioners then timely filed the instant appeal.

## II. Subject Matter Jurisdiction

We review de novo a district court's grant of a motion to dismiss for lack of subject matter jurisdiction. Asociacion De Empleados Del Area Canalera v. Panama Canal Comm'n, 329 F.3d 1235, 1237-38 (11th Cir. 2003).

"In a given case, a federal district court must have at least one of three types of subject matter jurisdiction: (1) jurisdiction under a specific statutory grant; (2) federal question jurisdiction pursuant to 28 U.S.C. § 1331; or (3) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)." Baltin v. Alaron Trading Corp., 128 F.3d 1466, 1469 (11th Cir. 1997). Although petitioners' causes of action appear to arise under the FAA, it is by now well established that the FAA does not by itself confer subject matter jurisdiction upon the federal courts. Instead, some independent basis of subject matter jurisdiction is necessary. Id. The parties agree that diversity jurisdiction is lacking in this case. Thus, the only possible independent basis for finding subject matter jurisdiction is federal question jurisdiction.

A.

Tamiami Partners Ltd. ex rel. Tamiami Development Corp. v. Miccosukee

Tribe of Indians of Florida, 177 F.3d 1212 (11th Cir. 1999) ("Tamiami III"), established the test in this circuit for determining federal question jurisdiction over a § 4 petition. Tamiami involved a complex dispute over an agreement between an Indian tribe and a developer to manage a bingo hall. The parties' agreement incorporated the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"), and its associated regulations, and provided that all disputes arising from the contract would be arbitrated. Nevertheless, the tribe claimed that the developer had repeatedly violated the agreement and announced that it considered the agreement to be terminated. The developer sued in federal district court, and its complaint came before this Court on three separate occasions. Only on the third try did we hold that it had successfully pled its claim.

In the first attempt, the developer alleged that the tribe could not unilaterally terminate the agreement without first arbitrating its complaints, and sought to compel such arbitration. We held that the developer merely stated an ordinary breach of contract claim, and we dismissed the claim for lack of federal question jurisdiction. Tamiami Partners, Ltd. v. Miccosukee Tribe, 999 F.2d 503, 508 (11th Cir. 1993) ("Tamiami I").

Meanwhile, the tribe had begun denying gaming licenses to the developer's employees. In the second attempt, the developer alleged that this was an abuse of the

13

tribe's authority conferred upon it by IGRA, and as such constituted a breach of the parties' agreement and a violation of IGRA. We held that the developer had now pled facts giving rise to a federal question, but dismissed the claim because IGRA itself provided no right of relief for the developer, and the tribe had only waived its sovereign immunity with respect to actions to compel arbitration or confirm arbitration awards, not breach of contract actions. Tamiami Partners, Ltd. v. Miccosukee Tribe, 63 F.3d 1030, 1047 & n.61 (11th Cir. 1995) ("Tamiami II").

Finally, on its third attempt, the developer pled the same facts regarding the licensing dispute but sought a declaration that the licensing dispute was arbitrable, confirmation of an arbitration award concerning part of that dispute, and compelled arbitration of still other aspects of the licensing dispute. The Tamiami III panel noted that

> these very same claims were before this court in Tamiami II, albeit in the context of a direct breach of contract suit against the Tribe. The Tamiami II panel concluded that these claims arose under federal law because the Agreement incorporated -- by operation of law if not by reference -- the provisions of IGRA and its associated regulations regarding licensing procedures.

Tamiami III, 177 F.3d at 1222-23. The panel concluded that "federal law is equally implicated when these claims are presented in the arbitration context," and added the following critical footnote:

14

> The Federal Arbitration Act empowers a district court to issue an order compelling arbitration if the court, "save for [the arbitration] agreement, would have jurisdiction under title 28, in a civil action...of the subject matter of a suit arising out of the controversy between the parties." 9 U.S.C. § 4 (1994). Thus, it is appropriate for us to "look through" Tamiami's arbitration request at the underlying licensing dispute in order to determine whether Tamiami's complaint states a federal question.

Id. at 1223 n.11 (alteration and omission in original). The Tamiami III panel then held that the developer's second amended complaint stated a federal question. Id. at 1223.

We read Tamiami III as holding that § 4 directs a district court to take subject matter jurisdiction over a § 4 petition if it would have subject matter jurisdiction over the dispute-to-be-arbitrated. In that case, we concluded, on the basis of § 4, that it was appropriate for the district court to "look through" the § 4 arbitration petition at the underlying dispute in order to determine whether there was a federal question. Tamiami III is our only case to squarely address the question of whether federal question jurisdiction over a § 4 petition exists when the underlying dispute to be arbitrated states a federal question, and the Supreme Court has not squarely addressed the matter. As such, Tamiami III is binding on us. Therefore, the district court, in determining whether it had federal question jurisdiction over the instant § 4 petition, was right to cite Tamiami III and ask whether the underlying dispute to be arbitrated

15

states a federal question.

B.

However, we think that the district court too easily assumed that the dispute petitioners seek to arbitrate is defined by Strong's state-court complaint. Petitioners are the "initiating parties" in the arbitration proceeding that they seek to initiate, and they are the plaintiffs in this independent action. We therefore look to petitioners' own statement of the dispute or disputes they wish to arbitrate, and in this, they are not limited to seeking compelled arbitration of claims that have been brought against them in court. Under the FAA, any party to such an agreement may seek to compel any dispute that falls within the scope of the agreement upon a showing that the other party has "fail[ed], neglect[ed], or refus[ed]" to participate in arbitration of it. 9 U.S.C. § 4.[10]

_____

[10] Our opinion in First Franklin Financial Corp. v. McCollum, 144 F.3d 1362 (11th Cir. 1998) (per curiam), is instructive. There, a borrower, McCollum, had sued his bank, First Franklin, and one of its employees, Dingle, in state court, alleging that a loan he had taken out was fraudulent under state law. In McCollum's state action, complete diversity was lacking because McCollum and Dingle were both citizens of Alabama. However, the bank then by itself brought an independent § 4 petition in federal court seeking to compel arbitration of McCollum's claims. On appeal, McCollum challenged the district court's subject matter jurisdiction over the bank's § 4 petition, making two related arguments. First, McCollum argued "that diversity jurisdiction is lacking because the state-court action is not removable due to Dingle's Alabama citizenship." We rejected this argument:

> As a matter of both § 1332's language and common sense, whether another action is removable or not does not affect jurisdiction in this, an independent action….The state-court action has three parties, but only two are parties to this action seeking an order compelling arbitration. It is perfectly consistent, therefore,

16

A careful reading of the instant petition reveals that petitioners seek to arbitrate two disputes: (1) Strong's state-court usury claims, see, e.g., Pet. at 13 (praying, inter alia, that "Respondent's claims proceed on an individual basis in arbitration"); and (2) petitioners' own affirmative claim that the loan is governed by Section 27 and is thus legal -- a claim for which they allege they plan to seek declaratory relief from the arbitrator, see id. ¶ 11. If either of these two disputes-to-be-arbitrated states a federal question, the district court has subject matter jurisdiction over the petition to compel. The district court examined only the first of these disputes and held that because Strong's usury claims against the payday affiliates were not completely preempted by Section 27, they did not arise under federal law. We need not, and thus do not,

> for removal jurisdiction to lack in one, but subject matter jurisdiction to be present in the other.

Id. at 1363. Second, McCollum argued that a federal court has subject matter jurisdiction over a § 4 petition only if it would have subject matter jurisdiction over the "underlying dispute" to be arbitrated which, he suggested, was defined by his own state-court complaint. Again, we rejected this argument:

> The "underlying dispute" that 1st Franklin seeks to arbitrate is not McCollum's quarrel with 1st Franklin's codefendant Dingle, but McCollum's quarrel with 1st Franklin. Although 1st Franklin accuses McCollum of suing Dingle just to defeat removal, for present purposes we assume that McCollum honestly believes that Dingle is for some reason independently liable to McCollum. So there are two "underlying disputes," McCollum v. Dingle and McCollum v. 1st Franklin, even though both may arise from the same transaction. 1st Franklin seeks to arbitrate only McCollum v. 1st Franklin, and there is undoubtedly diversity in that underlying dispute. There is, therefore, federal subject matter jurisdiction over the petition.

Id. at 1364.

17

address whether the district court erred in reaching this conclusion because, as we explain below, the second dispute-to-be-arbitrated -- petitioners' declaratory judgment claim -- does arise under federal law.[11]

## C.

Petitioners state in their petition that, among other things, "[i]n the arbitration demanded by this Petition, Petitioners will seek a declaration that the interest on [Strong's] Loan is governed by Section 27 and that the Loan is lawful." Pet. ¶ 11. Under Tamiami III, we must "look through" the petition to compel arbitration and instead ask: If petitioners had brought this dispute in federal district court as a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201[12], would it have arisen under federal law?

We established the test for determining whether a claim under the Declaratory

---

[11] Determining whether Strong's usury claims are completely preempted by Section 27 and thus arise under federal law requires answers to complex, fact-bound questions involving the relationship between Section 27 and Georgia usury law, the nature of the agency relationship between the bank and the payday stores in this case, and how both Section 27 and Georgia usury law apply to that particular agency relationship. We need not grapple with them because petitioners' prayer for declaratory relief plainly arises under federal law.

[12] The Declaratory Judgment Act provides, in relevant part:

(a) In a case of actual controversy within its jurisdiction,...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

18

Judgment Act arises under federal law in Household Bank v. JFS Group, 320 F.3d 1249 (11th Cir. 2003). There, we noted that "[t]he operation of the Declaratory Judgment Act is procedural only." Id. at 1253 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937)). Thus, a plaintiff may not bring a declaratory judgment action in federal court alleging subject matter jurisdiction under § 1331 merely by citing the Act itself, or even by virtue of the fact that he seeks a declaration of his rights and obligations under some federal law. Instead, we held that "federal-question jurisdiction exists in a declaratory judgment action if the plaintiff has alleged facts in a well-pleaded complaint which demonstrate that the defendant could file a coercive action arising under federal law." Id. at 1251. Thus, the jurisdictional question before us now becomes this: Do petitioners allege facts in a well-pleaded complaint which demonstrate that Strong could file a coercive action against them arising under federal law? We conclude that the answer is yes.

Petitioners allege that "[b]ased on the allegations currently set forth in the State Complaint, including allegations that the Cash America Petitioners violated the Georgia Racketeer Influenced and Corrupt Organizations statute, State Complaint at 87-96, [Strong] is in a position, if he chose, to amend the State Complaint to allege violations against Petitioners of the federal Racketeer Influenced and Corrupt

19

Organizations Act."  Pet. ¶ 10.  We agree.[13]

Petitioners correctly note that an action under the Georgia RICO statute, O.C.G.A. § 16-14-1 et seq., and one under the federal RICO statute, 18 U.S.C. § 1961 et seq., are "essentially the same."  The Georgia Act imposes civil liability on those who, "through a pattern of racketeering activity...maintain...any interest in or control of any enterprise," or "participate in...such enterprise" through employment or association, or who conspire to do the same.  O.C.G.A. § 16-14-4(a)-(c).[14] "'Enterprise' means any person,...corporation,...or other legal entity; or any...association, or group of individuals associated in fact although not a legal entity;

---

[13] Petitioners argued below, and press on appeal, a slightly different argument with respect to the potential federal RICO claim they allege Strong could bring against them. Petitioners ask us to hold that Household Bank applies directly to FAA actions, such that a district court has federal question jurisdiction over a § 4 petition if the FAA defendant could bring a coercive action arising under federal law against the FAA petitioner.  We need not address this alternative ground for subject matter jurisdiction and do not do so today.

[14] The substantive section of the Georgia RICO statute provides, in relevant part:

(a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

(b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

(c) It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section.

O.C.G.A. § 16-14-4.

and it includes illicit as well as licit enterprises and governmental as well as other entities." Id. § 16-14-3(6). "'Racketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under [various] laws of [Georgia]," including "Code Section 16-17-2, relating to payday loans." Id. § 16-14-3(9)(A)(xxxviii). The payday statute, in turn, makes it unlawful to charge, on a loan of less than $3,000, an interest rate exceeding 16% per annum. Id. § 16-17-2(a)(1)(G). "'Pattern of racketeering activity' means:...Engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission..., provided at least one of such acts occurred after July 1, 1980, and that the last of such acts occurred within four years...after the commission of a prior act of racketeering activity." Id. § 16-14-3(8)(A).

In his state court complaint, Strong alleged that the payday lenders comprised a "criminal enterprise" that targeted a common victim -- namely, "Georgia's most vulnerable and desperate consumers." Pet. Ex. A ¶¶ 91, 94. He alleged that they violated the Georgia RICO statute through "a pattern of racketeering activity that

included...numerous acts of usury" and through conspiracy to do the same.[15]  Id. ¶¶ 92, 89.  Finally, Strong alleged that he was charged the equivalent of an annual percentage rate of 252.692% on his loan.  Id. ¶ 33.

The same allegations could easily serve as the basis for a claim alleging a violation of the federal RICO statute.  Like the Georgia RICO statute, the federal RICO statute imposes civil liability[16] upon those who, "through collection of an unlawful debt...maintain...any interest in or control of any enterprise which is engaged in...interstate...commerce," or "participate...in the conduct of such enterprise" through employment or association, or who conspire to do the same.  18 U.S.C. § 1962.[17]

---

[15] Strong also alleged that the payday lenders committed the predicate act of theft by taking, deception and conversion.  Pet. Ex. A ¶ 92; see also O.C.G.A. § 16-14-3(9)(A)(ix) (making theft by taking, deception or conversion predicate acts under the Georgia RICO statute).

[16] See 18 U.S.C. § 1964(c) ("Any person injured in his...property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....").

[17] The substantive section of the Federal RICO statute includes, in relevant part, the following language:

> (a) It shall be unlawful for any person who has received any income derived... through collection of an unlawful debt in which such person has participated as a principal..., to use or invest...any part of such income...in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate...commerce....

> (b) It shall be unlawful for any person...through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Like the Georgia act, the federal act defines an "enterprise" as "any individual,...corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. § 1961(4). Unlawful debt is defined as "a debt (A)...which is unenforceable under State...law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with...the business of lending money...at a rate usurious under State...law, where the usurious rate is at least twice the enforceable rate." Id. § 1961(6). As noted above, Strong alleges that under the Georgia payday statute his loan is unenforceable owing to its usurious rate of interest. And the loan's annual interest rate of 252.692% far exceeds "twice the enforceable rate" of 16% under Georgia law.[18]

Strong does not deny that the facts he alleges in his complaint in support of a

-----

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through...collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962.

[18] In setting out the potential federal RICO claim Strong could bring against petitioners, we of course express no opinion on the merits of such a claim. Nor do we express any opinion on the merits of the state RICO claim he has already brought.

23

Georgia RICO claim could also support a federal RICO claim. Instead, he argues that at the time they filed the instant petition, the petitioners were not threatened by the possibility that Strong could bring a federal RICO action because he had already brought a coercive action against (some of) the petitioners (his state-court complaint) in which he "expressly disavowed any federal claims that he could assert." Reply Br. at 10-11 (citing State Complaint ¶ 14). Strong says this fact distinguishes the instant case from Household Bank and the out-of-circuit cases that Household Bank cites, where no coercive action at all had been brought by the declaratory judgment defendants. "Here," he says, "there is no[] threat of litigation or fear of the unknown. [Strong] has filed his suit against the Payday Lenders (not CSB) alleging only state law claims (not federal claims)." Id. at 13. Again, we are unpersuaded.

Household Bank involved short-term loans issued by a bank at the request of a tax preparation service for its customers to cover the amount of the customer's anticipated tax refund. Some loan recipients initiated a class action lawsuit against the bank in the United States District Court for the Northern District of Illinois, alleging both federal and state claims. That lawsuit eventually settled. Over 600 Alabama loan recipients, however, had chosen to opt out of the class action suit. In short order, some of them threatened in an affidavit that if a similar settlement were not reached with the bank, they would "pursue litigation through the Courts here in

24

Alabama which are favorable to plaintiffs with valid causes of action such as these." Household Bank, 320 F.3d at 1252. In response, the bank and the tax preparation service filed an action in federal district court under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), against five groups of potential Alabama plaintiffs seeking a declaration that the arbitration provisions in the loan agreements were enforceable. They argued that the district court had federal question jurisdiction over their declaratory judgment action because at the time they filed that action, the defendant borrowers "could have filed a non-frivolous coercive action in federal court under [the federal Truth in Lending Act], the National Bank Act, or RICO." Household Bank, 320 F.3d at 1252.

We agreed, and held that "a federal district court has subject-matter jurisdiction over a declaratory judgment action if, as here, a plaintiff's well-pleaded complaint alleges facts demonstrating the defendant could file a coercive action arising under federal law." Id. at 1259. The district court in that case had held that federal question jurisdiction was lacking, reasoning that

> if a declaratory judgment plaintiff may seek relief in federal court based on the fact that the declaratory judgment defendant may assert a federal claim, even though he may also limit his coercive action to only state claims, that is tantamount to allowing a declaratory judgment plaintiff to force the other party to litigate a claim that he may have no intention of pursuing.

25

<u>Id.</u> at 1254 (quoting <u>Household Bank v. JFS Group</u>, 191 F. Supp. 2d 1292, 1303 (M.D. Ala. 2002)). For better or worse, we responded, the Declaratory Judgment Act allows declaratory judgment plaintiffs to do just that. "Concerns that permitting a party to seek a declaration under the [Declaratory Judgment Act] where the defendant <u>could</u> file a coercive action under state <u>or</u> federal law eviscerates the principle that [the] plaintiff is the master of his or her claim, must be addressed to the legislative branch of our Government." <u>Id.</u> at 1258 (emphasis in original).

Finally, we addressed the defendant borrowers' argument, similar to Strong's here, that they had informed the district court that they did not intend to file a federal claim against the bank or the tax preparation service, and that after the instant declaratory judgment action was filed, some defendants had in fact filed non-federal claims in state court. We held that "[i]n determining whether a district court has subject-matter jurisdiction, we must look to the facts as they existed at the time the action was filed," <u>id.</u> at 1259, and as of that time (and, indeed, up to the time of our appellate decision), "[t]he Alabama Defendants ha[d] not entered into a settlement agreement or filed a release of their federal claims in this matter, nor [ha]d they request[ed] the district court to enter judgment against them. Regardless of their present renunciation, without a <u>binding, judicially enforceable agreement</u>, the Alabama Defendants could still put [the bank] and [the tax preparation service] to the

26

task of defending against the non-frivolous federal law claims alleged in this declaratory judgment action." Id. at 1260 (emphasis added).

On August 6, 2004, Strong filed suit in state court against the payday lenders. His complaint included a state RICO claim, but emphasized that it did not include any federal claims. On September 9, the state-court payday defendants removed that action to federal court. On the same day, the payday defendants and the bank joined in filing the instant FAA petition.

Strong plainly made a strategic decision not to bring any federal claims against the state-court defendants in an attempt to prevent his lawsuit from being removed to federal court. That Strong chose not to bring a federal RICO action, however, does not mean that he "could" not have done so. Without "a binding, judicially enforceable agreement," Strong could still have put petitioners to the task of defending against a non-frivolous federal RICO claim. Indeed, on the same day that petitioners filed the instant petition, the state-court defendants removed Strong's action to federal court, and had they succeeded (Strong would not move to remand for another week, and the district court would not grant that motion for another three months), Strong would no longer have had any reason not to amend his complaint to add a federal RICO claim. We have previously held that the fact that a plaintiff "chose to initiate the action in state court without [federal] claims" is not a

27

"substantial reason" under Rule 15 of the Federal Rules of Civil Procedure for denying leave to amend the complaint to add federal claims once the defendant has succeeded in removing the state-law case to federal court, and that the plaintiff will not be "bound by that choice." Halliburton & Assocs., Inc. v. Henderson, Few & Co., 774 F.2d 441, 443 (11th Cir. 1985) (affirming district court's denial of leave to amend on other grounds).[19] As we explained, the plaintiff's "choice of a state court forum was defeated by the removal. Once [the plaintiff] found itself in federal court, it may well have decided a different litigation strategy was in order." Id.

Kidder, Peabody & Company, Inc. v. Maxus Energy Corp., 925 F.2d 556 (2d Cir. 1991), which we discussed at some length and with approval in Household Bank, see 320 F.3d at 1259-60, presented a fact pattern similar to the one we confront in this case. There, the declaratory judgment defendant, Maxus, had threatened to bring

---

[19] As we explained in Halliburton:

Federal Rule of Civil Procedure 15 provides that a party seeking to amend its complaint more than twenty days after service must seek leave of the court or written consent of the adverse party. The rule also states that "leave shall be freely given when justice so requires." Although the decision whether to grant leave is within the discretion of the district court, the rule contemplates that leave shall be granted unless there is a substantial reason to deny it. Epsey v. Wainwright, 734 F.2d 748 (11th Cir. 1984). Permission may be denied where leave would cause undue delay or prejudice to the opposing party, where prior amendments have failed to cure deficiencies, or if the motive of the amendment is dilatory. Id. at 750; see also Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618 (11th Cir. 1983).

28

various claims, including one federal claim, against the plaintiff, Kidder. However, Maxus then filed an action in state court bringing only state-law claims. 925 F.2d at 559, 562. Two hours later, Kidder filed a declaratory judgment action in federal district court, alleging federal question jurisdiction on the ground that Maxus could bring a federal claim against it. Id. at 559. Maxus moved to dismiss for lack of subject matter jurisdiction and mootness, representing to the district court that it would never bring any such federal claim against Kidder. Id. at 560, 562-63. The Second Circuit rejected that argument:

> A controversy ceases to be "real and immediate" when "the issues presented are no longer 'live' or when the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969)….This is not a case where the parties have entered into a settlement, or where the defendant has entered into a binding, judicially enforceable agreement. In those situations, the claims inarguably were moot. By contrast, Maxus attempts to unilaterally bar Kidder's claims for declaratory relief simply by representing that it will not bring an action under the federal securities laws.
>
> Without a declaratory judgment, Maxus again could put Kidder to the task of defending against the federal securities claims. A judicial declaration that Maxus is barred from asserting the [federal claims] would both settle the matter between these parties once and for all and dispel all uncertainty regarding the liability of Kidder for these claims.

Id. at 563 (emphasis added, citations and quotation marks omitted). The situation is similar here. Neither the fact that Strong brought a suit asserting only state-law claims nor the fact that he has since represented that he will not amend that complaint

29

to add federal claims prohibits Strong from changing his mind.

Because petitioners' § 4 FAA arbitration petition alleges facts which demonstrate that Strong could file a federal RICO claim against them, under Household Bank, the district court would have federal question jurisdiction over a declaratory judgment action by petitioners that the loan is lawful and its interest rate is governed by Section 27. And because one of the underlying disputes to be arbitrated plainly includes this declaratory judgment action, and because when we "look through" under Tamiami III that action arises under federal law, the district court had federal question jurisdiction over petitioners' action to compel arbitration. Since the claims-to-be-arbitrated that are reflected in Strong's usury complaint "arise out of a common nucleus of operative fact with" the declaratory judgment claim, they "form part of the same case or controversy under Article III of the United States Constitution" and we easily find that the district court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a).[20] See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966); Parker v. Scrap Metal Processors, Inc., 468 F.3d 733, 742-

---

[20] Section 1367(a) provides, in relevant part:

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

43 (11th Cir. 2006).

## III. <u>Conclusion</u>

The district court's judgment dismissing the petition for lack of subject matter jurisdiction is reversed and remanded for further proceedings. On remand, the district court should enforce the parties' agreement to arbitrate if and when the court satisfies itself "that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4.[21]

---

[21] Just over one week before oral argument in this appeal, Strong filed with us a Suggestion of Mootness, arguing that the petition to compel arbitration is moot as to all petitioners and should be dismissed. As to the payday petitioners, Strong argues that a sanction imposed against the state court payday defendants by the Georgia trial court prevents the payday petitioners in this action from succeeding on their petition to compel arbitration. While the instant FAA petition had been pending in federal district court, the state court payday defendants' motion to stay the state court proceedings and compel arbitration had been pending before the state court after remand. The state trial court apparently ordered the parties to conduct discovery on the factual issues relating to whether the arbitration agreement was subject to the defenses of "fraud in the factum" and procedural unconscionability. On October 11, 2006, the state court found that defendants wilfully failed to timely produce documents that were requested by Strong and ordered to be produced by the court, and, as sanction, struck defendants' arbitration defenses alleged in their answer. Strong then filed his Suggestion of Mootness, arguing that the state trial court's order (which Strong attached) striking the defense of arbitration "mooted" the payday petitioners' "ability to compel arbitration in a state or federal forum against...Strong." Suggestion of Mootness at 3.

Strong cites no case and offers no legal theory for this conclusion. Certainly the law of former adjudication will not help him. In considering whether to give preclusive effect to state court judgments under the doctrines of res judicata (or claim preclusion) or collateral estoppel (or issue preclusion), we apply that state's law of preclusion. See <u>Kizzire v. Baptist Health Sys., Inc.</u>, 441 F.3d 1306, 1308 (11th Cir. 2006) (res judicata); <u>Agripost, Inc. v. Miami-Dade County, ex rel. Manager</u>, 195 F.3d 1225, 1229 n.7 (11th Cir. 1999) (collateral estoppel). Under Georgia law, for a claim to be barred under the doctrine of res judicata, the following elements must be met: "(1) identity of the cause of action, (2) identity of the parties or their privies, and (3) previous adjudication on the merits by a court of competent jurisdiction." <u>Karan, Inc. v. Auto-Owners Ins. Co.</u>, 629 S.E.2d 260, 262 (Ga. 2006). The doctrine of collateral estoppel "precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in

31

**REVERSED AND REMANDED.**

---

another action between the same parties or their privies." Id. at 262. Even assuming that the state court's sanction of striking portions of the payday defendants' pleading operates as an adjudication on the merits for purposes of preclusion, see, e.g., Brantley v. Sparks, 306 S.E.2d 337, 338 (Ga. App. 1983) (sanction of dismissal after finding of willful violation of discovery order operates as an adjudication on the merits), a further requirement of both res judicata and collateral estoppel under Georgia law is that the prior adjudication be final. "It is the general rule that a judgment sought to be used as a basis for the application of the doctrine of res judicata (or collateral estoppel) must be a final judgment. In Georgia a judgment is suspended when an appeal is entered within the time allowed. And the judgment is not final as long as there is a right to appellate review." CS-Lakeview At Gwinnett, Inc. v. Retail Dev. Partners, 602 S.E.2d 140, 142 (Ga. App. 2004) (quoting Greene v. Transport Ins. Co., 313 S.E.2d 761, 763 (Ga. App. 1984)); see also O.C.G.A. § 9-12-19 ("Where a judgment is entered and, within the time allowed for entering an appeal, an appeal is entered, the judgment shall be suspended."); Mayor & Alderman of City of Forsyth v. Monroe County, 392 S.E.2d 865, 866 (Ga. 1990) (doctrine of estoppel by judgment did not preclude federal court from holding that state statute was unconstitutional even though state court had previously held statute to be constitutional where state court judgment was being appealed at time of federal court judgment). In response to Strong's Suggestion of Mootness, the payday lenders stated that their time for appeal has not expired and that they intend to appeal the Georgia trial court's sanction. Strong has not contradicted this claim, nor is there any indication in the record before us that the state-court suit is final, as required under Georgia law before a judgment can have any preclusive effect. As a result, the instant case is not moot as to the payday lenders.

As for the bank, Strong argues for the first time that the bank cannot compel arbitration of Strong's state-court claims because the bank is not a party to that suit, nor has Strong brought any other claims against the bank. However, the fact that the bank is not a named party in any particular lawsuit is irrelevant; the bank plainly is a party to the arbitration agreement included in the loan contract. See Commercial Metals Co. v. Balfour, Guthrie, & Co., 577 F.2d 264, 266 (5th Cir. 1978) (the right to compel arbitration derives from the parties' agreement to arbitrate). As we have explained in Part II.B, supra, under the FAA, all that is required for one party to an arbitration agreement to compel another party to arbitrate a dispute is the "alleged failure, neglect, or refusal" of the latter to arbitrate that dispute. 9 U.S.C. § 4. Such failure to arbitrate need not manifest itself in the form of a lawsuit; it is enough that one party has demonstrated an unwillingness to arbitrate a dispute within the scope of the arbitration agreement. Here, Strong filed a lawsuit claiming that the interest rate is invalid. The bank, along with other "initiating parties," sent Strong's counsel a Notice of Intent to Arbitrate disputing Strong's claims and demanding that he participate in arbitration of all disputes arising from the loan. Strong responded that he believed that the loan contract to be "unconscionable and unenforceable." This is more than sufficient to show that Strong and the bank have an active dispute, and that Strong is unwilling to abide by their arbitration provision, given his belief that the entire contract is unenforceable.

MARCUS, Circuit Judge, specially concurring, in which JORDAN, District Judge, joins:

As should be clear from the majority opinion, I concur in the judgment and in all other aspects of our opinion in this case. I do so because I believe that we are bound by Tamiami Partners Ltd. ex rel. Tamiami Development Corp. v. Miccosukee Tribe of Indians of Florida, 177 F.3d 1212 (11th Cir. 1999) ("Tamiami III"), which held that the text of § 4 of the FAA, 9 U.S.C. § 4, requires a district court, in determining whether it has federal question jurisdiction over a § 4 arbitration claim, to "look through" that claim and instead ask whether the underlying dispute the petitioner seeks to arbitrate states a federal question.[1] I write separately to explain why I believe this holding is wrong, or at the very least ill-considered, and why the important, indeed basic, jurisdictional question embodied both in Tamiami III and in this case is ripe for en banc review by this Court or certiorari review by the Supreme

---

[1] Section 4 of the FAA provides, in relevant part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement....

9 U.S.C. § 4.

Court.[2]

As more than one court of appeals has noted, the "clear weight of authority" is that § 4 does not make federal question jurisdiction over a petition to compel arbitration dependent on the nature of the underlying dispute to be arbitrated. See, e.g., Kasap v. Folger Nolan Fleming & Douglas, Inc., 166 F.3d 1243, 1246 (D.C. Cir. 1999) (noting as much but not reaching the issue itself); see also U.S. Bank Nat'l Ass'n ND v. Strand, 243 F. Supp. 2d 1139, 1141-45 (D. Or. 2002) (following the "great weight of authority" in holding irrelevant the federal nature of the underlying claim to be arbitrated).

Indeed, Tamiami III's stance puts this Court squarely at odds with at least four of our sister circuits, and aligns us with just one other circuit. Compare Westmoreland Capital Corp. v. Findlay, 100 F.3d 263, 267-69 (2d Cir. 1996) ("[T]he text of FAA § 4 should not be interpreted to mean that a federal court has subject matter jurisdiction over an action to compel or stay arbitration merely because the underlying claim raises a federal question. A petition under FAA § 4 to compel or stay arbitration must be brought in state court unless some other basis for federal

---

[2] While I object to the rule announced in footnote 11 of Tamiami III, I hasten to add that I do not quarrel, for several reasons, with the outcome of that case, in which we held that the complaint stated a federal question. Tamiami III was a complex case, before us for the third time, involving Indian land and tribal court power over non-Indians. Federal questions thus lurked around every corner of that case. See also notes 11 and 12, infra.

jurisdiction exists, such as diversity of citizenship or assertion of a claim in admiralty."); Prudential-Bache Sec., Inc. v. Fitch, 966 F.2d 981, 986-88 (5th Cir. 1992) (holding, in response to an argument that § 4 directs the federal courts to take federal question jurisdiction over a § 4 petition based on the federal nature of the dispute to be arbitrated, that "when we read the [FAA] in light of its history and purpose and in conjunction with well established rules for determining federal question jurisdiction, we find that interpretation unpersuasive"); Smith Barney, Inc. v. Sarver, 108 F.3d 92, 94 (6th Cir. 1997) ("Our cases have made clear...that the Federal Arbitration Act does not supply an independent basis for federal jurisdiction, nor does the federal nature of the underlying claims that were submitted to arbitration. The rights asserted by Smith Barney in this case are based simply on an interpretation of the contract to arbitrate, as opposed to the actual merits of the underlying substantive claims." (citations omitted)); and Wisconsin v. Ho-Chunk Nation, 463 F.3d 655, 659 (7th Cir. 2006) ("[T]his circuit has recognized that [a] strong body of caselaw has developed...holding that the nature of the underlying dispute [in arbitration] is irrelevant for purposes of subject matter jurisdiction, even on a motion to compel [arbitration]...[T]he motion itself must involve diversity or federal question jurisdiction. Thus, we do not look to the Nation's underlying complaint in arbitration, but confine our analysis to the federal claims articulated in Wisconsin's complaint

35

before the district court." (citations and quotation marks omitted, first and last alterations added)), with Discover Bank v. Vaden, 396 F.3d 366, 373 (4th Cir. 2005) ("A federal court may...hear a § 4 petition to compel arbitration if, but for the arbitration agreement, subject matter jurisdiction over the case would otherwise exist by virtue of a properly invoked federal question in the underlying dispute.").

Moreover, this issue on which the circuits are plainly split is an important one. Actions are regularly filed under the FAA, and the approach adopted by our Court in Tamiami III and by the Fourth Circuit in Vaden, which finds federal question jurisdiction to compel arbitration whenever the dispute before the arbitrator raises a federal question even though the federal court itself is asked only to enforce a private contract, considerably expands federal court jurisdiction. At the very least, this important issue merits more consideration than we were able to give it in Tamiami III, where we were confronted, for the third time, with a multi-count complaint presenting an array of complex issues including many that were federal in nature.

In urging reconsideration of Tamiami III's holding, I stress three points. First, Tamiami III is in considerable tension with the Supreme Court's jurisprudence articulating the longstanding well-pleaded complaint rule. Second, Tamiami III is also in some tension with the path adopted in our own precedent applying the well-pleaded complaint rule to FAA actions. Third, while the text of § 4 is susceptible to

36

more than one reasonable interpretation, I believe the better interpretation is that § 4 does not allow the federal courts to make an exception to the well-pleaded complaint rule and "look through" the claim embodied in the arbitration petition to the underlying dispute presented to the arbitrator for resolution. As I suggest below, Tamiami III's reading of § 4 produces a most unusual result: while the Supreme Court has made clear that the plain language of § 4 forbids federal district courts from adjudicating the merits of the dispute to be arbitrated and allows them to adjudicate only the arbitrability of the dispute by interpreting the parties' contract, and while the § 4 FAA petitioner's very purpose in going to federal district court is to have an arbitrator, rather than any court, resolve the underlying dispute to be arbitrated, Tamiami III interprets § 4 as nevertheless requiring the federal district courts to address the underlying dispute carefully enough to determine whether it states a federal question. Yet the federal district court does this, not so that it can resolve any of the parties' rights or remedies under federal law, but simply so that it can take subject matter jurisdiction of a § 4 FAA action that is often nothing more than an ordinary contract action.

## I. Tamiami III Is in Tension with the Well-Pleaded Complaint Rule

My first serious reservation with the rule that Tamiami III announces is that it is in considerable tension with the Supreme Court's case law construing what it

means for a suit to "arise under" federal law for purposes of 28 U.S.C. § 1331, including those cases that establish the longstanding well-pleaded complaint rule. The Supreme Court has instructed us that the well-pleaded complaint rule requires the federal courts to find a federal question, if at all, only "from what necessarily appears in the plaintiff's statement of his own claim," Okla. Tax Comm'n v. Graham, 489 U.S. 838, 840-41 (1989), and not from any additional allegations that they did in fact plead, but which were not "necessary" to their cause of action. A straightforward application of that rule, I believe, yields the conclusion that the federal nature of the underlying dispute to be arbitrated is irrelevant in determining whether a § 4 cause of action filed in district court itself arises under federal law.

Nearly a century of Supreme Court case law developing the well-pleaded complaint rule requires a federal court to find federal question jurisdiction only where the necessary elements of the petitioner's cause of action present such a question, or where the determination of his suit depends on the resolution of a substantial question of federal law.  See, e.g., Shulthis v. McDougal, 225 U.S. 561, 569 (1912) (suit does not arise under federal law "unless it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of [federal] law, upon the determination of which the result depends"); Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 27-28 (1983) (federal question jurisdiction exists only

when the "well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law"); id. at 13 (where cause of action is not created by federal law, "federal jurisdiction is unavailable unless...some substantial, disputed question of federal law is a necessary element of...the well-pleaded state claim[]"); Okla. Tax Comm'n v. Graham, 489 U.S. 838, 840-41 (1989) ("[W]hether a case is one arising under [federal law]...must be determined from what necessarily appears in the plaintiff's statement of his own claim...unaided by anything alleged in anticipation o[r] avoidance of defenses ....").

When I consider the allegations that were essential to petitioners' § 4 cause of action in this case, I cannot find lurking in them any federal question. I reach this conclusion in three steps: first, although reference to the FAA necessarily appears in petitioners' statement, due to the "anomalous" nature of the FAA, this reference plainly is insufficient to confer federal jurisdiction over the petition; second, the remaining necessary elements of the instant FAA petition sound in contract and do not state a federal question; and, finally, the allegations found in the petition that do aver a federal question -- specifically, allegations concerning Section 27 and those embodied in the application for declaratory judgment -- are not part of a well-pleaded § 4 FAA petition but rather are wholly unnecessary, and thus under the well-pleaded

39

complaint rule may not form the basis of federal question jurisdiction.

A.

First, as we noted in the majority opinion, although reference to the FAA necessarily appears in petitioners' statement, it is by now well-established that the FAA is an "anomaly in the field of federal-court jurisdiction," and the mere fact that petitioners bring an action under the FAA is by itself insufficient to confer federal jurisdiction over the petition. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n.32 (1983) ("The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331...or otherwise....[Under § 4], there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue." (emphasis added)); Southland Corp. v. Keating, 465 U.S. 1, 15 n.9 (1984) ("While the Federal Arbitration Act creates federal substantive law requiring the parties to honor arbitration agreements, it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 or otherwise. This seems implicit in the provisions in § 3 for a stay by a 'court in which such suit is pending' and in § 4 that enforcement may be ordered by 'any United States district court which, save for such

40

agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties.'" (citation omitted)); see also Baltin v. Alaron Trading Corp., 128 F.3d 1466, 1472 (11th Cir. 1997); Commercial Metals Co. v. Balfour, Guthrie, & Co., 577 F.2d 264, 268 (5th Cir. 1978).[3]

B.

Second, the remaining necessary elements of the instant FAA petition sound in contract and do not state a federal question. A § 4 cause of action requires the allegation of only a narrow set of facts, all of them sounding in contract. To see why this is so, it is helpful to recognize that a § 4 petitioner merely asks the court to specifically enforce a contract. Section 4 "provides a remedy to a party seeking to compel compliance with an arbitration agreement." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403 (1967). The right to specifically enforce an arbitration agreement, like the right to specifically enforce any contract, derives from the parties' agreement. See, e.g., John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547 (1964) ("[W]hether or not [a party] [i]s bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the

_____

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

41

contract entered into by the parties.... The duty to arbitrate [is] of contractual origin ...."); Commercial Metals, 577 F.2d at 266 ("[T]he question of whether or not a dispute arising out of a contract will be subject to the arbitration process is left solely to the agreement of the parties to the contract....Thus, in seeking to compel arbitration, .... the basis of the plaintiff's complaint is the contractual agreement of the parties to arbitrate.").

Because the right to compel arbitration is based on the parties' agreement to arbitrate, the district court, in adjudicating a § 4 petition, is limited to interpreting that agreement and may not adjudicate the substantive dispute to be arbitrated once it determines that the dispute falls within the scope of the arbitration agreement. See, e.g., AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649-50 (1986) ("[C]ourts...have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious," so that even a claim the court finds "frivolous...is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator."); Prima Paint, 388 U.S. at 400 ("Section 4...directs the federal court to order arbitration once it is satisfied that an agreement for arbitration has been made

42

and has not been honored."); Jenkins v. First Am. Cash Advance of Ga., Inc., 400 F.3d 868, 881 (11th Cir. 2005) ("[A]n arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration.").

Given the contractual basis of a party's right to compel arbitration and the district court's limited and equally contract-based role in enforcing that right, it should come as no surprise that a § 4 cause of action is defined by a narrow set of "necessary elements": "To state a claim to compel arbitration under the FAA, the plaintiff must allege: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision which purports to cover the dispute; (3) the relationship of the transaction (evidenced by the agreement) to interstate or foreign commerce;[4] and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."  Larry E. Edmondson, Domke On Commercial Arbitration § 22:2 (3d ed. 2003) (citing Whiteside v. Teltech Corp., 940 F.2d 99, 102 (4th Cir. 1991)); see also InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003) ("A party who attempts to compel arbitration must show that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is

---

[4] The FAA only applies to arbitration agreements involving maritime disputes and contracts involving interstate commerce.  See 9 U.S.C. § 2.

bound by that clause, and that the claim asserted comes within the clause's scope.");

Webb v. Investacorp, Inc., 89 F.3d 252, 257-58 (5th Cir. 1996) (per curiam) (in adjudicating a motion to compel arbitration under the FAA, the courts use state-law contract principles to consider whether there is a valid agreement to arbitrate between the parties and whether the dispute in question falls within the scope of that arbitration agreement); PaineWebber, Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990) ("Before compelling an unwilling party to arbitrate, § 4...requires the court to engage in a limited review to ensure that the dispute is arbitrable -- i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.").[5]

Applying these elements to this case, a well-pled petition necessarily would have alleged the following: (1) a dispute exists between Strong and the petitioners over whether the loan is enforceable -- as evidenced by Strong's failure to pay back the loan according to its terms, by his initiation of a lawsuit alleging that the loan is void, and by the parties' correspondence regarding arbitration; (2) the parties' written

---

[5] Even the petitioners in this case acknowledge that the basic "elements required to support [an] action to compel arbitration" are few: "Section 4 of the FAA only requires the existence of a written arbitration agreement and a refusal to comply with the agreement by one of the parties to support an action to compel compliance." Pet'rs' Resp. to Resp't's Suggestion of Mootness at 3 (emphasis added); see also id. at 5 ("A 'live' case or controversy...continues to exist under Section 4 of the FAA because there is a written arbitration agreement between Appellee and Appellants and Appellee still refuses to comply with that written arbitration agreement.").

loan agreement contains an arbitration clause covering "[a]ny controversy or claim" between Strong and either the bank or Cash America "arising out of or in any way relating to" the loan; (3) the loan agreement involves interstate commerce between a South Dakota bank and a Georgia borrower; and (4) Strong has failed, neglected or refused to arbitrate the dispute, as evidenced by his response to petitioners' request that he arbitrate all disputes between them arising out of the loan and by his allegations in state court that the arbitration provision is unconscionable and unenforceable. These allegations <u>alone</u>, if true, suffice for petitioners to receive all the relief they seek from the district court -- namely, for the court "to require [Strong] to individually arbitrate, in accordance with the arbitration provision...certain legal disputes." Pet. at 1-2. These essential elements of a § 4 petition make out a simple contract enforcement claim, nothing more. Most assuredly they do not raise a federal question.

C._____

_____Third, although the instant petition often refers to Section 27, such references are not part of a well-pled § 4 petition and thus cannot serve as the basis on which the petition states a federal question. See <u>Westmoreland</u>, 100 F.3d at 269 ("The fact that the face of the petition alludes to the respondents' [federal] Exchange Act claim does not vitiate th[e] result [that the § 4 FAA petition does not state a federal question]: the

45

petition...is not a 'well-pleaded complaint.'"). Petitioners' references to Section 27 could plausibly be said to serve three purposes. None, however, is <u>necessary</u> to their cause of action.

First, petitioners sometimes characterize the dispute to be arbitrated as involving Section 27. As I have just explained, the existence of an arbitrable dispute between the parties is indeed one of the "essential elements" of a well-pled § 4 petition. Yet while it is true that a § 4 petition must necessarily allege the existence of a dispute between the parties, the nature of that dispute is relevant only insofar as the court, before ordering arbitration, must be satisfied that the dispute comes within the ambit of the parties' arbitration clause. Here, the dispute to be arbitrated, most simply stated, is whether the loan is valid and enforceable.[6] Given the breadth of this arbitration clause, which covers <u>any</u> dispute "arising out of or in any way relating to" the loan agreement, a dispute over the validity of the loan's interest rate clearly falls within the ambit of the parties' agreement to arbitrate. It is thus not necessary for petitioners to plead <u>why</u> one party believes the loan to be valid (because the loan, issued by the bank, is governed by Section 27), while another does not (because the loan, issued by the payday affiliates as de facto lenders, does not enjoy the protection

---

[6] I take my cue here from petitioners themselves, who at one point succinctly characterized Strong's claims-to-be-arbitrated as "seek[ing] to have loans made by [the bank] declared void and unenforceable." Pet'rs' Resp. to Respondent's Suggestion of Mootness at 6.

of Section 27 and is thus subject to Georgia's usury laws).

Even if it were somehow necessary for petitioners to characterize the dispute in a way that refers to Section 27 -- say, as a dispute about "whether the loan is governed by Section 27 or by Georgia usury law" -- this mere reference would be insufficient to confer federal question jurisdiction over the petition. It is a "long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction," nor does it automatically render the cause of action "the kind of adjudication for which jurisdiction would serve congressional purposes and the federal system." Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 813-14 & n.11 (1986). Under the well-pleaded complaint rule, for a suit to arise under federal law, the "result" of the suit must "depend[]" on the "determination" of "a dispute or controversy respecting the validity, construction, or effect of [federal] law," Shulthis, 225 U.S. at 569; see also Franchise Tax Bd., 463 U.S. at 27-28 (1983) (federal question jurisdiction exists only when the "well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law"). The result of petitioners' suit to compel arbitration continues to depend wholly on an interpretation of the parties' agreement to arbitrate, not on an interpretation of Section 27.

47

Second, petitioners refer to Section 27 in an attempt to show that Strong's claims-to-be-arbitrated arise under federal law, and that their own § 4 petition arises under federal law as a result. A logical corollary of the rule that we determine federal question jurisdiction only from what necessarily appears in petitioners' statement of their cause of action is that we may not determine federal question jurisdiction from what unnecessarily appears there. While Section 27 may be one of the "necessary elements" of one or more disputes to be arbitrated, it is not a necessary element of the § 4 contract enforcement action before the court, and the well-pleaded complaint rule prevents us from considering it in determining federal question jurisdiction over that action.[7]

There is a third arguable relevance that Section 27 could have to today's petition (although it is not clear that any of petitioners' actual references to Section 27 were intended for this purpose): Section 27 may serve in the petition as a

---

[7] For the same reason, it is irrelevant that petitioners attach as an exhibit to their petition Strong's state court complaint. See Application of Prudential Sec. Inc., 795 F. Supp. 657, 659 n.5 (S.D.N.Y. 1992) (rejecting argument that petition to stay arbitration pleads issues of federal law by incorporating opposing party's original RICO complaint, the arbitration of which the petition sought to stop, because "[i]t is clear...that the petition to stay refers to the demand for arbitration, and attaches that document as an exhibit, merely to identify the action. Such reference does not demonstrate that the RICO laws or the federal securities laws are an essential element in [the petition to stay arbitration]"); see also Albert Einstein Med. Ctr. v. Nat'l Benefit Fund for Hosp. and Health Care Employees, 740 F. Supp. 343, 348 (E.D. Pa. 1989) (mere reference to ERISA in an exhibit to the complaint does not make ERISA an "essential element" of plaintiffs' claim).

substantive reply to Strong's anticipated defense. That is, in response to petitioners' claim that Strong is bound by his promise to arbitrate all disputes arising out of the loan, Strong may argue that he cannot be compelled to arbitrate under the parties' agreement because that agreement is void <u>ab initio</u> under Georgia usury law. And in reply, petitioners may claim that the agreement is governed by Section 27 which, under the Supremacy Clause, <u>see</u> U.S. Const. art. VI, cl. 2, "trumps" Georgia law (in the sense of ordinary "conflict preemption"). Or Section 27 may serve to show that Strong's anticipated defense under Georgia usury law is <u>completely</u> preempted, such that Strong's anticipated defense itself arises under federal law.[8]

Under the well-pleaded complaint rule, however, pleadings that simply anticipate the respondent's federal defense (or offer a federal reply to an anticipated state-law defense) are insufficient to bring the petitioner's own cause of action within federal jurisdiction. <u>See</u> <u>Rivet v. Regions Bank of La.</u>, 522 U.S. 470, 475 (1998) ("A defense is not part of a plaintiff's properly pleaded statement of his or her claim.");

---

[8] <u>See</u> <u>Cliff v. Payco Gen. Am. Credits, Inc.</u>, 363 F.3d 1113, 1121-22 (11th Cir. 2004) (distinguishing "express preemption," complete or "field preemption," and claim or "conflict preemption"). "'Conflict preemption'...arises in two circumstances: when it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law." <u>Id.</u> at 1122. Complete, or field, preemption "occurs when federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it." <u>Id.</u> Unlike complete preemption, conflict preemption is quite common and a complaint raising state-law claims that are merely conflict preempted by federal law may not, on that basis, be removed to federal district court.

Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908) ("It is not enough that the plaintiff alleges some anticipated defense to his cause of action, and asserts that the defense is invalidated by some provision of the [laws] of the United States. Although such allegations show that very likely, in the course of the litigation, a question under [those laws] would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under [them]."); see also Westmoreland, 100 F.3d at 269 ("The rights of the respective parties under the Exchange Act...will enter the [§ 4 FAA] dispute, if at all, only if they are raised as part of the respondents' answer to the petition. Petitioners' alleged right to stay arbitration is not derived from the Exchange Act, but from...the FAA.").

Moreover, even if the well-pleaded complaint rule allowed us to consider defenses that state a federal question, it is doubtful that Section 27 would arise as a valid defense to petitioners' § 4 claim. The defenses available to a respondent to a petition to compel arbitration, like the elements of a § 4 petition, correspondingly hew to the parties' agreement. Under Prima Paint and its progeny, an arbitration provision is severable from the remainder of the contract containing it and separately enforceable even if the remainder of the contract is later found by an arbitrator to be void. A party may successfully defeat a § 4 petition by specifically challenging the validity of the agreement to arbitrate, but not by challenging the validity of the

50

contract as a whole; the latter kind of challenge is for the arbitrator to decide. See

Buckeye Check Cashing, Inc. v. Cardegna, ___ U.S. ___, 126 S. Ct. 1204, 1209

(2006). Thus, even a party's claim that a usurious finance charge renders the contract

as a whole void ab initio is for the arbitrator, not the court, to decide, and is no

defense to a motion to compel arbitration. Id.; see also Bess v. Check Express, 294

F.3d 1298, 1306 (11th Cir. 2002) (same); Jenkins v. First Am. Cash Advance of Ga.,

Inc., 400 F.3d 868, 883 (11th Cir. 2005) (allegation that "underlying payday lending

transactions are void ab initio under Georgia law...is an issue for an arbitrator, not the

court, to decide"). To the extent that Strong's state-court usury claims challenge the

validity of the loan agreement as a whole, they would not properly appear in the

instant FAA pleadings even as a response to petitioners' § 4 cause of action.

In short, regardless of whether petitioners' allegations concerning Section 27

appear in order to (1) allege the existence of a dispute between the parties, (2) allege

that the claim to be arbitrated states a federal question, or (3) possibly anticipate

Strong's response to their claim to arbitrate, these references to Section 27 do not

appear necessarily, and thus they cannot confer federal question jurisdiction over this

§ 4 FAA petition. The remaining, necessary allegations of petitioners' § 4 suit merely

make out a simple contract enforcement action. Under the Supreme Court's

jurisprudence construing the well-pleaded complaint rule and "arising under"

51

jurisdiction, such an action does not state a federal question. Tamiami III's rule to the contrary is thus in considerable tension with this longstanding precedent.

## II. Tamiami III Is in Tension with this Court's Case Law on FAA Petitions

Tamiami III's rule requiring the district court to "look through" the § 4 cause of action before them to a different dispute to be resolved before a different decision-maker, the arbitrator, is also in measureable tension with cases in which we have applied the well-pleaded complaint rule to FAA actions. Thus, for example, in Commercial Metals Co. v. Balfour, Guthrie, & Co., 577 F.2d 264 (5th Cir. 1978), the parties to a purchasing agreement containing an arbitration clause disputed whether the seller's provision of steel complied with the terms of their contract. The buyer sued in state court, alleging breach of contract on those grounds, and the seller initiated a freestanding FAA petition in federal district court seeking to compel arbitration. The petitioner alleged federal question jurisdiction under § 1331, apparently under the theory that the FAA itself confers federal question jurisdiction.

A panel of the former Fifth Circuit first rejected any notion that the plaintiff's suit to compel arbitration "rest[ed] upon" § 2 of the FAA, the Act's central substantive section which provides that an arbitration provision within a contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 577 F.2d at 266. The Court

explained that prior to the enactment of the FAA, at common law, arbitration agreements were not specifically enforceable by courts, and that the effect of § 2 "is simply to remove the previously viable defenses of the party opposing arbitration." Id. We concluded, therefore, that instead of resting on the FAA itself, "the basis of the plaintiff's complaint is the contractual agreement of the parties to arbitrate." Id.

The former Fifth Circuit then turned to the question of whether such a complaint resting on the parties' agreement and seeking to enforce that agreement "is one arising under the laws, treaties or Constitution of the United States." Id. The Court held that the answer to that question was controlled by the "landmark case" of Gully v. First National Bank, 299 U.S. 109 (1936), which

> [d]eclar[ed] the general principle that "'[a] suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of such a law, upon the determination of which the result depends,'" 299 U.S. at 114, 57 S. Ct. at 98, quoting Shulthis v. McDougal, 225 U.S. 561, 569, 32 S. Ct. 704, 56 L. Ed. 1205 (1912) (citations omitted)....

Id. at 267 (alteration in original). In applying to the case at hand the general principle that a suit does not arise under federal law unless it "involves a [federal] dispute or controversy...upon the determination of which the result depends," the former Fifth Circuit assumed that the relevant "dispute or controversy" to be analyzed was the

petition to compel arbitration, not the steel dispute to be arbitrated. And because that "alleged right to compel arbitration derives from the agreement of the parties, not from any federal law," id. at 268, the Court held that the suit did not arise under federal law under Gully.

Of course, in Commercial Metals, the dispute to be arbitrated was not federal in nature -- it was clearly an ordinary breach of contract suit. Indeed, no one suggested otherwise, and so the Court had no occasion to address the question we face today: whether the federal nature of the dispute to be arbitrated can be the basis of federal question jurisdiction over a § 4 petition to compel arbitration of that dispute.

Nevertheless, Commercial Metals sensibly suggests that the appropriate dispute to which we ought to apply the well-pleaded complaint rule is the dispute to be resolved by the district court, not the dispute which will eventually be resolved by the arbitrator. Thus, the Court analyzed the nature of the "right to compel arbitration," not the nature of the right to collect damages due to the other party's alleged failure to perform according to the specifications of a purchase agreement. Since the nature of the right to compel arbitration does not change depending on whether the underlying dispute to be arbitrated arises under federal law, applying Commercial

Metals's reasoning to a § 4 petition where the underlying dispute to be arbitrated may arise under federal law should yield the same result.[9]

In the instant case, at least one "dispute or controversy...upon the determination of which the result" of the arbitration proceeding "depends" is a dispute "respecting the validity, construction, or effect of" federal law. But the "dispute or controversy...upon the determination of which the result" of the § 4 FAA action "depends" is the dispute over whether Strong must arbitrate the parties' disagreements. And this dispute depends only on an interpretation of the parties' arbitration agreement, nothing more. Thus, it is not one "respecting the validity, construction, or effect of" federal law.

---

[9] A district court has made just this point about Commercial Metals:

> The Commercial Metals court applied the principles enunciated in Gully in order to determine whether the plaintiff's right arose under the laws of the United States. Finding that the "right to compel arbitration" derived from the private agreement of the parties, not from any federal law, the Commercial Metals court held that federal question jurisdiction was absent. Admittedly, unlike the present case, the dispute to be arbitrated in Commercial Metals did not involve federal law. However, the court there did not rely on the nature of the contract dispute to reject jurisdiction, but instead, following Gully, examined the source of the plaintiff's "right" as asserted in the complaint. Following this analysis, a similar result would be reached here because Prudential's alleged right to stay arbitration derives from a private contract,…not from federal law.

Application of Prudential Securities Inc., 795 F. Supp. 657, 660 (S.D.N.Y. 1992).

55

When determining the existence of federal jurisdiction over other FAA causes of action, we have similarly limited ourselves to a consideration of the FAA action before us and have not examined the underlying action that would be presented to the arbitrator. Thus, Baltin v. Alaron Trading Corp., 128 F.3d 1466 (11th Cir. 1997), involved whether there was subject matter jurisdiction over an action to vacate, modify, or correct the arbitration award under §§ 10 and 11 of the FAA. We first extended our analysis of §§ 3 and 4 of the FAA and held that, like them, "sections 10 and 11 of the FAA do not provide an independent statutory grant of federal subject matter jurisdiction." 128 F.3d at 1471-72.

Next, we "turn[ed] to the second potential jurisdictional basis: federal question jurisdiction" under § 1331. Id. at 1472. Analyzing that potential basis, we again applied the well-pleaded complaint rule, and found jurisdiction lacking. We noted that under that rule, "[f]ederal question jurisdiction exists only when the 'well-pleaded complaint standing alone establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" Id. (quoting Franchise Tax Bd., 463 U.S. at 27-28). As for the first prong of the Franchise Tax Board test, we noted that even though §§ 10 and 11 appear to create causes of action, the Supreme Court has held

that a suit brought pursuant to the FAA is not intrinsically a case presenting a federal question.  Id.

Turning to the second prong of the Franchise Tax Board test, we determined that the plaintiffs' "right to relief did not depend on the 'resolution of a substantial question of federal law.'" Id.  Importantly, in reaching this conclusion, we once again analyzed not the right to relief sought before the arbitrator, but only the right to relief sought before the district court.  Thus, while it is true that in Baltin, as in Commercial Metals, the dispute in arbitration was not federal in nature, we held that the plaintiffs' FAA complaint did not state a federal question because they "moved to vacate, modify, or correct the arbitration award based only on alleged misdeeds of the arbitrators," an action which "does not require the resolution of any federal issue, let alone a 'substantial question of federal law.'"  Id.

Commercial Metals and Baltin both sensibly suggest, at least as a general matter, that district courts ought to apply the well-pleaded complaint rule to the FAA cause of action before them, and not to some other underlying dispute that may be presented to the arbitrator, and as to which the district courts have no adjudicatory power.

At all events, applying the Supreme Court's Franchise Tax Board test to the instant § 4 action, the relief that petitioners seek from the district court is still specific

enforcement of their arbitration agreement with Strong, notwithstanding the federal nature of at least one of the disputes they wish to arbitrate. And their right to the relief of specific enforcement still derives from the parties' agreement, not from any federal law. Specifically, petitioners' right to relief does not necessarily depend on the resolution of any substantial question concerning Section 27 of the FDIA. Instead, petitioners will succeed in compelling arbitration, if at all, solely upon an interpretation of the parties' arbitration agreement, and in interpreting their agreement, the district court need address no question of federal law (other than the FAA).

## III. Section 4 Does Not Require an Exception to the Well-Pleaded Complaint Rule

It seems clear to me that Tamiami III is not easily reconciled with the well-pleaded complaint rule, and that it travels down a path far different than the one taken by this Court's precedent which has applied that rule to FAA actions. However, Congress undeniably has the power to direct the district courts to make an exception to the well-pleaded complaint rule. Tamiami III based its holding on an interpretation of the unique language of § 4, which, after all, allows a district court to entertain a petition to compel arbitration if the court would, save for the arbitration provision, have subject matter jurisdiction over "a suit arising out of the controversy between

58

the parties." 9 U.S.C. § 4. Tamiami III must have interpreted the "controversy between the parties" as a reference to the underlying controversy to be arbitrated, rather than to the controversy then before the district court. This portion of § 4 had not previously been interpreted by this Court, and nothing in Commercial Metals or Baltin prevented the Tamiami III panel from reaching the interpretation it did. Nevertheless, I believe this interpretation was mistaken.

In addition to Tamiami III, the district court in this case cited Discover Bank v. Vaden, 396 F.3d 366 (4th Cir. 2005), issued by the Fourth Circuit -- the only other circuit court to hold that federal question jurisdiction over a § 4 FAA action turns on the existence of a federal question in the underlying dispute to be arbitrated. Although Vaden is of course not binding on this Court, in reaching the same conclusion as Tamiami III, Vaden provides a thorough -- though, in my opinion, ultimately unconvincing -- explanation for the holding that § 4 directs district courts to take federal question jurisdiction over a petition to compel if the underlying dispute to be arbitrated states a federal question. In Vaden, the Fourth Circuit held, on facts similar to those we address today[10], that a federal question must be found, if at all,

_____

[10] In Vaden, the servicing affiliate of a bank that issues credit cards brought a collection action against a card holder in state court to recover a debt in excess of $10,000. The card holder responded by filing several state-law class action counterclaims, including some that alleged illegal assessment of finance charges, late fees, and interest rates. The affiliate, together with the bank, then initiated an independent § 4 petition in district court, seeking to arbitrate the card holder's counterclaims against the affiliate, which they argued were completely preempted by

59

"beyond the arbitration petition" in "the overall substantive conflict between the parties" to be arbitrated. 396 F.3d at 370.

Like the Tamiami III panel, the Fourth Circuit based its holding in large part on the unique language of § 4 of the FAA, which permits a party to an arbitration agreement to "petition any United States district court which, save for such [arbitration] agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties." 9 U.S.C. § 4. The Fourth Circuit found three phrases significant. None of the arguments are convincing.

## A. Jurisdiction "under Title 28"

First, the Fourth Circuit noted that if subject matter jurisdiction were based solely on the FAA cause of action before the district court (rather than on the cause of action or other dispute to be arbitrated), then a § 4 petition will rarely, if ever, state a federal question, since it is essentially a claim to specifically enforce a contract. As

Section 27. The card holder argued that subject matter jurisdiction was lacking, that the bank lacked standing to compel arbitration of claims that were not brought against it, and that she had not entered into a valid arbitration agreement. See 396 F.3d at 367-68. Addressing the jurisdictional issue on appeal, the Fourth Circuit held that three phrases of § 4 compelled the conclusion that federal question jurisdiction over a § 4 petition exists where the dispute to be arbitrated itself states a federal question. Id. at 369, 373. On remand, the district court found that the bank was the true lender and thus a party of interest in the state court action, and also that the FDIA completely preempted the card holder's counterclaims. The court then found that the arbitration agreement was valid, and compelled arbitration. Discover Bank v. Vaden, 409 F. Supp. 2d 632, 635-37 (D. Md. 2006).

a result, the argument goes, federal courts will hear § 4 petitions essentially only when diverse parties are involved. The Fourth Circuit concluded that if Congress had intended this scenario, then it would not have referred so broadly in § 4 to "jurisdiction under Title 28." Rather, Congress would have instead referred to "jurisdiction under 28 U.S.C. § 1332," the diversity statute. See Vaden, 396 F.3d at 370.

I believe the Fourth Circuit has read too much into a benign reference to Title 28. Assuming that Congress intended subject matter jurisdiction to be determined on the basis of the § 4 petition itself (without looking "through" or "beyond" it to the dispute to be arbitrated), it is not true that diversity is the only applicable basis of federal jurisdiction under Title 28, and so there was good reason for Congress not to have limited jurisdiction over § 4 petitions to diversity jurisdiction. Thus, "when the arbitration clause sued on is part of a maritime contract, the admiralty jurisdiction [under 28 U.S.C. § 1333] will apply to the arbitration petition as well as to the underlying suit." Drexel Burnham Lambert, Inc. v. Valenzuela Bock, 696 F. Supp. 957, 964-65 (S.D.N.Y. 1988); see also Continental U.K., Ltd. v. Anagel Confidence Compania Naviera, S.A., 658 F. Supp. 809 (S.D.N.Y. 1987) (finding admiralty jurisdiction over § 4 petition).

And in a great many other cases, where the party resisting arbitration brings a federal cause of action, a district court will have <u>supplemental</u> jurisdiction under 28 U.S.C. § 1367 over the defendant's counterclaim to compel arbitration of the dispute. See, e.g., <u>Slomkowski v. Craig-Hallum, Inc.</u>, 644 F. Supp. 132 (D. Minn. 1986) (entertaining § 4 motion by defendant after it removed federal securities action against it); <u>Prudential-Bache Sec., Inc. v. Fitch</u>, 966 F.2d 981, 989 (5th Cir. 1992) (explaining that a federal court will be able to entertain a § 4 petition if "the case is already in federal court," say, because the underlying claim to be arbitrated was brought in state court and removed, by the party seeking to compel arbitration, to federal court).[11]

Finally, when the agreement to arbitrate itself arises under federal law, a § 4 action to enforce this federal right may state a federal question. See Valenzuela

---

[11] In this regard, both <u>Commercial Metals</u> and the instant case are procedurally odd, in that they are freestanding § 4 petitions where the only litigation before each district court was a petition to compel arbitration. The far more typical scenario is an "embedded proceeding": the party who does not wish to arbitrate a contractual dispute instead sues, and the defendant responds by filing a motion <u>with the same court</u> to stay those proceedings and compel arbitration. Where the dispute to be arbitrated arises under federal law, the suit will either already be in federal court when the defendant moves to compel arbitration, or the defendant can remove it to federal court and then move to compel arbitration.

<u>Tamiami III</u> itself, in fact, involved a kind of embedded § 4 claim, albeit a somewhat unusual one -- there, the same party seeking to compel arbitration also brought several substantive claims before the court, at least two of which, we said, raised federal questions. As a result, the district court could have exercised supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the § 4 claim. Thus, <u>Tamiami III</u> could have reached the same correct result and exercised subject matter jurisdiction over the § 4 claim without "looking through" the controversy before the court to the controversy before the arbitrator.

Bock, 696 F. Supp. at 965 (noting that a § 4 petition in a labor proceeding under the Labor Management Relations Act of 1947, 29 U.S.C. § 185 ("LMRA"), "will...be in federal court by virtue of the provisions of § 301" of the LMRA). Cf. Am. Fed'n of Television & Radio Artists, AFL-CIO v. WJBK-TV, 164 F.3d 1004, 1008 (6th Cir. 1999) (holding, in an action under § 7 of the FAA to enforce a subpoena issued by an arbitrator, that an "agreement to arbitrate itself arises under federal law" where it is part of collective bargaining agreement governed by § 301 of the LMRA). Agreements subject to the Employee Retirement Income Security Act of 1974 ("ERISA") may present a similar situation.[12]  I, therefore, believe it was altogether natural for Congress to have referred to Title 28 generally, rather than to its various independent components.

The Fourth Circuit, however, has raised a related concern about the lack of federal question jurisdiction over § 4 petitions. It concluded that the elimination of

---

[12] Again, this was surely the case in Tamiami itself. As the panel noted in Tamiami II, 63 F.3d at 1048, the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"), required the parties in that case to include in their contract a dispute resolution process such as arbitration. See 25 U.S.C. § 2711(b)(6); 25 C.F.R. § 531.1(k)(2). In Commercial Metals (and in most § 4 cases), "whether or not a dispute arising out of a contract will be subject to the arbitration process is left solely to the agreement of the parties to the contract," 577 F.2d at 266, and thus "the source of the alleged right to compel arbitration derives from the agreement of the parties, not from any federal law," id. at 268. In Tamiami, by contrast, whether or not the dispute will be subject to arbitration was not left "solely to the agreement of the parties" -- the IGRA required some sort of alternative dispute resolution -- and thus the source of the developer's right to compel arbitration did indeed depend on federal law. Tamiami III clearly reached the right result; I object only to the means by which it arrived at that result, and to the consequences of its § 4 holding.

federal question jurisdiction as a basis of jurisdiction over a § 4 petition would be "inconsistent with the 'congressional declaration of a liberal federal policy favoring arbitration agreements,'" under which "'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration,'" and arbitration agreements are placed "'upon the same footing as other contracts.'" Vaden, 396 F.3d at 372 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) and Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991)). According to Vaden, "the disfavor to arbitration lies in limiting § 1331 in these cases to such an extent that the real controversy between the parties cannot reach federal court even when the [state court] plaintiff's complaint emphatically presents a federal question." Id.

This, too, misapprehends both the congressional purpose behind the FAA and the Supreme Court's interpretation of that purpose. Moses H. Cone's holding regarding the "liberal federal policy favoring arbitration," under which "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," does not refer to the jurisdictional question we address today -- nor, in fact, to any jurisdictional question. Rather, the Court was addressing a scenario in which a court has already taken jurisdiction over a § 4 petition and must decide whether to send a dispute to arbitration or adjudicate that issue itself. The Court, referring back to

Prima Paint and its progeny, see supra Part I.C, reiterated that, when in doubt, both federal and state courts should find that a dispute falls within the scope of the parties' arbitration agreement and is thus "arbitrable," rather than adjudicating the dispute itself. See Moses H. Cone, 460 U.S. at 24-25 & n.31. The Supreme Court did not, however, suggest in the slightest way that, when in doubt over the existence of subject matter jurisdiction over a § 4 petition, federal courts should err on the side of taking jurisdiction. Federal courts are, after all, courts of limited subject matter jurisdiction, and the lower federal courts may exercise this power only over cases for which there has been a clear congressional grant of jurisdiction. Because the Constitution unambiguously confers this jurisdictional power to the sound discretion of Congress, "federal courts should proceed with caution in construing constitutional and statutory provisions dealing with [their] jurisdiction." Smith v. GTE Corp., 236 F.3d 1292, 1299 (11th Cir. 2001) (alteration in original).

As for the policy that arbitration agreements be placed "upon the same footing as other contracts," it is difficult to see how an interpretation of § 4 that results in most freestanding § 4 petitions failing to state a federal question would be inconsistent with the FAA's policy of placing arbitration agreements on an equal footing with other contracts, as the Fourth Circuit suggests. Actions to specifically enforce contracts, generally speaking, do not raise federal questions. Thus, finding

that an action to specifically enforce an arbitration agreement does not state a federal question amounts precisely to putting that agreement "upon the same footing as other contracts." Indeed, if anything, a violation of the equal footing policy occurs when a court holds that an otherwise ordinary contract enforcement action raises a federal question on the basis of some other cause of action that may be brought before an arbitrator. The FAA was designed to "make arbitration agreements as enforceable as other contracts, but not more so." Prima Paint, 388 U.S. at 404 n.12. It did not intend to "elevate [them] over other forms of contract." Id.

Finally, the Fourth Circuit's worry that "the real controversy between the parties cannot reach federal court even when the [state action] plaintiff's complaint emphatically presents a federal question," 396 F.3d at 372, seems to me to also be misplaced.[13] The party resisting arbitration who sues regarding the parties' federal

_____

[13] There is only one situation in which a federal dispute that a party seeks to arbitrate "cannot reach federal court," and that is when a freestanding § 4 petition is filed in district court. Today's case is a variation on this theme. Strong, the party resisting arbitration, did indeed bring a substantive case in state court, but defendants in that case were unsuccessful at removing the case to federal court. They therefore initiated an independent § 4 action in federal court. In such scenarios, the freestanding § 4 claim itself will almost certainly not state a federal question, for the reasons I have explained in Parts I and II, above. And because the federal claim-to-be-arbitrated is not pending before the same court, there will also be no basis for the federal court to exercise supplemental jurisdiction over the § 4 action. Thus, federal question jurisdiction will be lacking (though some other basis of subject matter jurisdiction, such as diversity or admiralty, may yet apply). Independent and embedded petitions to compel arbitration present wholly different jurisdictional scenarios. See Domke on Commercial Arbitration § 21:2 (3d ed. 2003) ("When a district court exercises the authority created by the FAA in an embedded proceeding, no difficulties with subject matter jurisdiction arise because the embedded proceeding is contained within litigation for which the subject matter jurisdiction is established. In

66

dispute can certainly bring his case in federal court if he so chooses. And if he does not choose to do so, the defendant can remove his suit to federal court and either participate in litigation there or file a counterclaim under § 4 compelling arbitration; the federal court will have supplemental jurisdiction over the § 4 counterclaim because of the plaintiff's federal claim.[14]

The Fourth Circuit's related suggestion that its reading of § 4 responds to the pragmatic concern that litigants "do not come to court solely to resolve the collateral issue of whether or not they have an agreement to arbitrate," but rather "incur[] the expense and burdens of litigation...to resolve their real-life conflicts and move on," Vaden, 396 F.3d at 370, also strikes me as unpersuasive. Even if the motivations of

---

independent proceedings, however, there must be diversity of citizenship or some other independent basis for federal jurisdiction."). Cf. Am. Fed'n of Television & Radio Artists, AFL-CIO, 164 F.3d at 1007 (noting, in an action under § 7 of the FAA seeking enforcement of a subpoena issued by an arbitrator, that "[c]are must be taken in addressing the question of jurisdiction [over this § 4 petition] because this is an independent action, rather than a claim 'embedded' in another controversy over which the district court already had subject matter jurisdiction").

[14] This is essentially what happened in the state-court case being litigated parallel to the instant independent FAA action. In the state-court action, Strong did bring a substantive claim concerning the parties' "real controversy," and the defendants did remove that suit to federal court, where they then moved to compel arbitration of Strong's claims. (As far as I can tell from the record, the state-court payday defendants did not plead that they also sought to compel arbitration of their own declaratory judgment claim, as petitioners in the instant independent action have pleaded.) However, the district court held that Strong's claims did not, in fact, state a federal question, and it remanded the case. I express no view as to whether the district court was correct in holding that Strong's claims did not arise under federal law. I note only that the state payday defendants had an opportunity to prove that that suit belonged in federal court, and a federal district court of competent jurisdiction found that they failed to meet their burden.

litigants could or should somehow affect a court's jurisdiction, I again observe that in fact, § 4 petitioners do <u>not</u> come to the district court to resolve the "real-life" conflict to be arbitrated, but rather do go there "solely" to resolve the collateral issue of the arbitrability of that conflict; this is precisely what the party who files a § 4 claim does.

Perhaps even more basic, it is important to recognize that the denial of a federal forum in such a case is no tragedy, for in these situations no one has asked a federal court to resolve the "real controversy between the parties." The party resisting arbitration has either not brought any lawsuit at all, or has chosen to bring a federal claim in state court or to bring only state-law claims. The § 4 FAA petitioner does not seek to have <u>any</u> court resolve "the real controversy between the parties," much less a federal court; it only seeks the assistance of a court in ordering that "real controversy" to arbitration. I can see no error -- of law, policy, or otherwise -- in denying a federal forum to a § 4 petitioner who (A) asks of the district court merely that it enforce an ordinary contract, and (B) vigorously asks that no court adjudicate the "real [federal] controversy between the parties."

Nor are such petitioners left without a remedy. Federal and state courts have concurrent jurisdiction to enforce the FAA, <u>see</u> <u>Baltin</u>, 128 F.3d at 1469 (citing <u>Moses H. Cone</u>, 460 U.S. at 25); <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v.</u>

Haydu, 637 F.2d 391, 395 (5th Cir. Feb. 1981), and "[i]t is clear that the state courts are entirely able, as well as required, to apply the [FAA] and compel arbitration...if the statutory requisites are present," Commercial Metals, 577 F.2d at 269; see also Moses H. Cone, 460 U.S. at 25 n.32 (noting that "enforcement of the [FAA] is left in large part to the state courts"); Giangrande v. Shearson Lehman/E.F. Hutton, 803 F. Supp 464, 474 n.23 (D. Mass. 1992) (holding that the federal nature of the underlying dispute in arbitration is irrelevant and noting that the "plaintiff is not left without a remedy, since the state courts have concurrent jurisdiction to enforce the provisions of the Federal Arbitration Act").

B. Any court "which, save for [the arbitration] agreement, would" have subject matter jurisdiction over "the controversy between the parties"

The Fourth Circuit's second and third arguments deduced from the text of § 4 are best treated together. Again, § 4 provides that a party seeking to compel arbitration may petition any court "which, save for [the arbitration] agreement, would have [subject matter] jurisdiction...[over] a suit arising out of the controversy between the parties." As for the "saving clause," the Fourth Circuit, noting that "save for" ordinarily means "but for" or "notwithstanding," held that "'save for such agreement' must mean that the district court would have jurisdiction of the case even if the agreement had never existed," and that the phrase should be read "as an instruction

69

to set aside the arbitration agreement and then consider the grounds for federal jurisdiction independently." Vaden, 396 F.3d at 369. As for the "controversy between the parties," the Fourth Circuit found that the "natural" reading of this phrase is as a reference to the dispute to be arbitrated. Id. at 370. As I read Vaden (and, for that matter, footnote 11 of Tamiami III), the relevant portion of § 4 could be rewritten as follows:

> A party seeking to compel arbitration may petition any district court which, putting aside the arbitration agreement and the motion to compel under it, would have subject matter jurisdiction over the dispute the party seeks to arbitrate if the party had instead brought that dispute before the district court to be adjudicated.

I read both phrases of § 4 differently. As for the saving clause, I read it as instructing the court to "set aside" not the arbitration agreement itself or the suit before it to specifically enforce that agreement, but merely the previous judicial hostility to arbitration agreements. I thus agree with several other courts in reading the saving clause as providing simply that "a court which is otherwise vested of jurisdiction of the suit would not be divested [of jurisdiction] by the arbitration agreement and may proceed to order arbitration, contrary to prior precedent." Drexel Burnham Lambert, Inc. v. Valenzuela Bock, 696 F. Supp. 957, 963 (S.D.N.Y. 1988); see also Westmoreland Capital Corp. v. Findlay, 100 F.3d 263, 267-68 & n.6 (2d Cir. 1996) (adopting the interpretation of the Drexel Burnham court); Prudential-Bache

70

Sec., Inc. v. Fitch, 966 F.2d 981, 988 (5th Cir. 1992) (same); Klein v. Drexel Burnham Lambert, Inc., 737 F. Supp. 319, 323 n.12 (E.D. Pa. 1990) (same).

This interpretation of § 4's saving clause is fully in keeping with both the FAA's overall purpose and § 2's similar saving clause. For a long time, courts would not specifically enforce arbitration agreements, on the self-serving theory that agreements to arbitrate ousted courts of jurisdiction. Indeed, the legislative history of the FAA makes unmistakably clear that its purpose was "to ensure judicial enforcement of privately made agreements to arbitrate" by "overrul[ing] the judiciary's longstanding refusal to enforce agreements to arbitrate." Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219-20 (1985)[15]; see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991); Scherk v. Alberto-Culver Co.,

---

[15] In making this point, the Supreme Court has quoted the following passage from the House Report accompanying the Act:

> The need for the law arises from an anachronism of our American law. Some centuries ago, because of the jealousy of the English courts for their own jurisdiction, they refused to enforce specific agreements to arbitrate upon the ground that the courts were thereby ousted from their jurisdiction. This jealousy survived for so long a period that the principle became firmly embedded in the English common law and was adopted with it by the American courts. The courts have felt that the precedent was too strongly fixed to be overturned without legislative enactment, although they have frequently criticised the rule and recognized its illogical nature and the injustice which results from it. This bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement.

Byrd, 470 U.S. at 219-20 & n.6 (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess., 1-2 (1924)).

417 U.S. 506, 510-11 & n.4 (1974); <u>Jenkins v. First American Cash Advance of Ga., LLC</u>, 400 F.3d 868, 874 (11th Cir. 2005) (purpose of FAA was to reverse judicial hostility to arbitration agreements and put them on equal footing with other contracts); <u>Commercial Metals</u>, 577 F.2d at 266 ("At common law, agreement in contracts to submit disputes arising therefrom to arbitration, for various reasons, were not specifically enforced by courts....").

Section 2, the FAA's primary substantive provision, provides that written arbitration agreements shall be enforceable "save upon such grounds as exist...for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has construed this "saving clause" as reflecting the Act's overall purpose "to make arbitration agreements as enforceable as other contracts, but not more so." <u>Prima Paint</u>, 388 U.S. at 404 n.12. Indeed, a panel of the former Fifth Circuit had occasion to hold that "the effect of Section 2...is simply to remove the previously viable defenses of the party opposing arbitration." <u>Commercial Metals</u>, 577 F.2d at 266.

I think that the "saving clause" of § 4 should be read, just like that of § 2, against the background of the Act's overall purpose of overturning the judiciary's longstanding refusal to enforce agreements to arbitrate. Therefore, I would read § 4's saving clause as providing that a party seeking to compel arbitration may petition any court which, but for the common law rule that arbitration clauses oust courts of

jurisdiction, "would have [subject matter] jurisdiction...[over] a suit arising out of the controversy between the parties."

As for the "controversy between the parties," this is perhaps the most ambiguous phrase in a section of the FAA replete with them.[16] The Fourth Circuit's reading of the "controversy between the parties" as a reference to the controversy to be arbitrated is plausible. However, I think the better reading of the "controversy

---

[16] The Supreme Court did not clarify § 4's reference to the "controversy between the parties" when it wrote:

> The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under § 1331 or otherwise. Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue. E.g., Commercial Metals at 268-69, and cases cited. Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence. Nevertheless, although enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate.

Moses H. Cone, 460 U.S. at 25 n.32 (emphasis added). See, e.g., Fitch, 966 F.2d at 987 n.3 (noting that "[t]he entire sentence from Moses Cone is helpful in understanding the Court's reference to the 'underlying dispute,'" and declining to "read this sentence as establishing a radical new rule for determining federal jurisdiction"); Application of Prudential Securities Inc., 795 F. Supp. 657, 660 (S.D.N.Y. 1992) (finding the Moses H. Cone footnote "capable of two interpretations" -- one requiring federal courts to take subject matter jurisdiction based upon the federal nature of the underlying dispute in arbitration, "and the other indicating that there must be an ongoing suit based on federal question jurisdiction before an order compelling arbitration can issue" -- and adopting the latter interpretation); Klein, 737 F. Supp. at 323-24 (describing Moses H. Cone's reference to the "underlying dispute" as "admittedly vague," but holding that it refers to the "arbitration dispute...before the Court").

between the parties" is as a reference to the controversy pending before the district court. See Fitch, 966 F.2d at 987 (reading the FAA as allowing courts to look to "the actual suit before the district court," not to "the underlying controversy between the parties"); Application of Prudential Securities Inc., 795 F. Supp. 657, 660 (S.D.N.Y. 1992) (same); Klein, 737 F. Supp. at 323-24 (same).

In many, perhaps most, cases, a § 4 claim will be brought in an embedded suit, so that the "controversy before the court" will consist not only of the § 4 claim but also of the dispute-to-be-arbitrated. Section 4 merely provides that if a district court has subject matter jurisdiction over the substantive suit (whether through original or removal jurisdiction), then the district court may now also entertain the claim to compel arbitration, notwithstanding the old rule under which such reliance on arbitration clauses ousted the court of jurisdiction.

In other cases, perhaps not contemplated by Congress, a freestanding § 4 claim will be brought, so that the only "controversy before the district court" will be whether a valid agreement requires arbitration of a particular dispute. When the parties are diverse or, say, a maritime contract is sued on, the district court will have jurisdiction over this arbitrability controversy. But because resolution of a controversy over abitrability is generally a matter of contract interpretation, a freestanding § 4 petition will usually not state a federal question.

74

Thus, on my reading, the relevant portion of § 4 could be rewritten this way:

> A party seeking to compel arbitration may petition any district court which, notwithstanding the prior common law rule that prevented courts from specifically enforcing arbitration agreements, is otherwise vested of subject matter jurisdiction over the suit before the court.

The central reason that I would read § 4 in this way is that the Fourth Circuit's (and Tamiami III's) alternative reading has the effect, in the § 4 context, of overturning the well-pleaded complaint rule. See Westmoreland, 100 F.3d at 268 (declining "to find that FAA § 4 constitutes a legislative reversal of the general rule that 28 U.S.C. § 1331 federal question jurisdiction must be determined based on the face of a 'well-pleaded complaint'"); Klein, 737 F. Supp. at 324 ("[T]o extend federal jurisdiction based on only plaintiffs' underlying federal claims runs contrary to the well established rule that, under § 1331, federal question jurisdiction must be established on the face of a 'well-pleaded complaint.'"); Valenzuela Bock, 696 F. Supp. at 963 ("[I]f this Act is construed to provide for a federal forum whenever the underlying dispute involves a federal question, it must be seen as overturning the well-established rule that under § 1331 federal question jurisdiction must be determined based on the face of a 'well-pleaded complaint.'"). Where Congress intends to create an exception to the well-pleaded complaint rule and expand federal jurisdiction, it generally does so explicitly. See Westmoreland, 100 F.3d at 268-69 (collecting

75

examples); Fitch, 966 F.2d at 988 ("There is no indication that Congress in enacting the FAA, or the Supreme Court in interpreting it, intended to change the rules for determining federal jurisdiction over a complaint."); Valenzuela Bock, 696 F. Supp at 964 & n.7 (collecting examples).

Finally, analogizing the FAA to the Declaratory Judgment Act, the Fourth Circuit insists that its reading of § 4 does not, in fact, overturn the well-pleaded complaint rule but merely applies that rule in the unique procedural context of the FAA. See Vaden, 396 F.3d at 371-72. The analogy to the Declaratory Judgment Act is inapposite. A Declaratory Judgment Act plaintiff who could face a federal claim being brought against it asks the federal district court to resolve the merits of that federal claim in advance. The timing, but not the meaning, of federal question jurisdiction is altered -- the Declaratory Judgment Act plaintiff's right to relief still "necessarily depends on resolution of a substantial question of federal law," Franchise Tax Bd., 463 U.S. at 28.

By contrast, the FAA petitioner who does or could face a federal claim being brought against it does not ask a federal district court to adjudicate that federal claim. See Fitch, 966 F.2d at 988 ("Prudential's 'well pleaded' complaint seeks one objective: to enforce its rights under its contract...and compel arbitration of the dispute....The petition does not ask the court [to] address any issues of federal law

(other than the FAA which does not provide a basis for federal jurisdiction) in deciding whether the arbitration clause is enforceable."); Klein, 737 F. Supp. at 324 ("Plaintiffs do not ask the Court to decide or address underlying federal laws apart from the FAA."); Valenzuela Bock, 696 F. Supp. at 963 ("The nature of the underlying dispute, (here a claim of fraud in violation of [the federal securities laws]), is not part of a well-pleaded complaint asking the court to order arbitration...."). The FAA petitioner merely asks the federal district court to enforce the parties' agreement to send the federal dispute to an arbitrator for resolution, and the petitioner's "right to [that] relief" will usually depend solely on the parties' agreement to arbitrate. See Fitch, 966 F.2d at 988 ("The...underlying dispute,...including claims that Prudential violated the federal securities laws, is not part of Prudential's complaint."); Klein, 737 F. Supp. at 324 ("Plaintiffs' action, requesting the Court to impute a contract term to the parties' arbitration agreement, does not raise a...'federal question.'"). Moreover, not only does the FAA petitioner not ask the federal district court to adjudicate the underlying federal claim to be arbitrated, the Supreme Court has instructed us that the plain language of the FAA bars the federal courts from passing on the merits of that underlying dispute. See supra Part I.B.

Yet although no party seeks, and the FAA precludes, adjudication of the underlying dispute on the merits, Tamiami III nevertheless requires federal district

77

courts adjudicating the § 4 FAA claim to at least pass on the underlying claim to be arbitrated in determining whether it (and thus the § 4 FAA petition) arises under federal law. In many cases, it will be obvious whether an underlying claim states a federal question. But in a significant number of cases, including today's, the matter will not be so simple. As we noted in the majority opinion, determining whether Strong's claims-to-be-arbitrated arise under federal law would require us to provide some answer to the very legal and factual questions that form the parties' underlying dispute -- a dispute which, under the clear policy of the FAA, is for an arbitrator to resolve. An interpretation of the FAA that requires the district court to strongly suggest an answer to the merits of the parties' underlying dispute, but merely as a means of determining whether it has subject matter jurisdiction to enforce a contractual agreement to send that dispute to the <u>arbitrator</u> for resolution, can only be described as odd. <u>Cf. Valenzuela Bock,</u> 696 F. Supp. at 964 n.6 ("To construe § 4 [as requiring the district court to look to the underlying dispute to be arbitrated to determine subject matter jurisdiction] would...entail needless confusion and waste over jurisdiction of a simple petition to compel arbitration. A petition in a local court asking nothing more than an order compelling arbitration may undergo first removal (requiring the parties to travel what may be a great distance to the federal court), followed by a motion for remand and debate over whether the underlying dispute

78

arises under federal or state law, and whether the right to identify its nature belongs to the plaintiff or the defendant. This can hardly be what was intended by a statute whose declared purpose was to simplify the resolution of contractual disputes by making arbitration agreements enforceable.").

## IV.

Because I do not read § 4 as requiring an exception to (or an alternative application of) the longstanding well-pleaded complaint rule in the § 4 context, I believe we ought to adhere to our ordinary understanding of that rule. And because the instant § 4 petition, were it well-pled, simply asks the district court to specifically enforce the parties' contract, I cannot see how it states a federal question. As a result, were I not bound by Tamiami III's holding requiring us to "look through" to the underlying disputes to be arbitrated, I would affirm the district court's dismissal of today's § 4 petition for lack of subject matter jurisdiction.

In reaching this conclusion, I readily admit that there is room for reasonable minds to disagree over the proper way to interpret § 4. But § 4's ambiguity -- and the great frequency of FAA litigation -- only means that more, and not less, attention should be paid by this Court and the Supreme Court to the proper method of

determining federal subject matter jurisdiction over FAA petitions.[17]  In a complex

case in which this was far from the only question presented, Tamiami III resolved in

a short footnote what five of our sister circuits, on both sides of the issue, have had

occasion to spill considerable ink carefully considering.  This important issue which

has split the circuits merits more consideration than either this Court or the Supreme

Court has given it.

---

[17] As should be evident from the discussion here, § 4 contains several phrases which must be read together to form a coherent whole.  Moreover, § 4 is but one part of the FAA, and we should interpret it in a way that is consistent with the Act's other sections.

Although it has no bearing on today's case, it is worth noting that footnote 11 of Tamiami III appears to hold that the text of § 4 compels a district court to look to the underlying dispute not only to determine the presence of federal question jurisdiction over a § 4 petition to compel arbitration of that dispute, but also to determine the presence of federal question jurisdiction over a § 9 petition to confirm an arbitration award.  See 177 F.3d 1222-23 & n.11.  It is wholly unclear to me how to transport § 4's unique language into § 9 (which simply provides that where the parties have agreed that a specified court shall affirm an arbitration award, any party may so petition that court, which "must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11" of the FAA.  See 9 U.S.C. § 9.).